BEAM, JUSTICE, FOR THE COURT:
 

 ¶ 1. Joseph Patton was convicted of murder following a jury trial in the Warren County Circuit Court. Patton appeals his conviction, claiming his trial was rendered fundamentally unfair by the trial court's refusal to strike for cause two prospective jurors from the jury venire who said during voir dire examination they knew the decedent's son. Finding no merit in Patton's claim, we affirm Patton's conviction.
 

 FACTS
 

 ¶ 2. In September 2015, Patton was living with his sixty-three-year-old uncle, Alfred Patton, in a mobile home in Warren County. On Tuesday, September 22, 2015, Alfred's next-door neighbor, William Thigpen, went to Alfred's trailer to check on him, having not seen Alfred in several days. Thigpen discovered Alfred's body inside the mobile home with an ax lodged in the throat. The body appeared to have been dead for several days.
 

 ¶ 3. Thigpen last saw Alfred alive on Friday, September 18. The Thursday night before, he and Alfred had watched a televised football game together at Alfred's trailer, and Patton also was present. Thigpen said Alfred had expressed to him on several occasions that Alfred did not like the circumstances of Patton living there.
 

 ¶ 4. Thigpen's live-in fiancé, Gabrielle Phillips, testified that Patton and Alfred had conflicts and that Alfred wanted Patton to move out. She recalled an argument Patton and Alfred had on Thursday, September 17, during which Alfred asked Patton to leave. Phillips said she heard Patton tell Alfred, "You keep on and one of these days you're going to regret it." Phillips said she last saw Alfred alive on Friday, September 18.
 

 ¶ 5. Phillips saw Patton on Saturday, September 19, and Patton spoke to her before going inside Alfred's trailer. He did not stay there long. She saw Patton again on Monday, September 21, between 4:00 and 4:30 p.m. They spoke to each other before Patton went inside Alfred's trailer. Phillips saw Patton come out of Alfred's trailer carrying a basket which Patton put in his car.
 

 ¶ 6. Warren County Sheriff's Investigator Chris Satcher described the ax which killed Alfred as a 26-inch Estwing brand camping ax. Investigators found a matching head cover for the ax in the trash outside Alfred's trailer. Investigators learned that a local Home Depot sells this brand of ax and obtained an in-store video from the store which showed Patton purchasing this type of ax on Wednesday, September 16, 2015. Investigators also obtained a receipt from the transaction, which showed a debit card was used to purchase the item.
 

 ¶ 7. Meanwhile, at the scene of the homicide, investigators observed and photographed a Cobra beer bottle on the floor inside the trailer, along with a Seagram's gin bottle. Satcher said the gin appeared to contain a cloudy foreign substance, which experts later determined was diphenhydramine, an active ingredient in Benadryl and other over-the-counter sleep aids.
 

 ¶ 8. Satcher also inspected and gathered a pair of athletic shorts from one of the trailer's bedrooms. Inside the shorts, Satcher found a folded envelope containing a grainy white powder similar to a crushed
 pill, which experts determined contained diphenhydramine.
 

 ¶ 9. Also found in the shorts was a debit card; a Nationwide life insurance proposal for a sixty-three-year-old male with a $25,000 death benefit; a document addressed to Patton referencing the last four digits of Patton's social security number; and a receipt from a convenience store in Vicksburg, Mississippi. The receipt was for gasoline and one King Cobra 32-ounce beer, and was dated September 18, 2015. The transaction was made with the debit card found in the shorts, which matched the debit card number used to purchase the ax.
 

 ¶ 10. On the front deck of Alfred's home, Satcher recovered a few folded towels, garbage bags, and a gallon container of household bleach. From these items, Satcher recovered a receipt from a Family Dollar store dated September 18, 2015, with a time stamp of 3:36 p.m. Investigators also obtained a video from the Family Dollar store showing Patton purchasing the bleach.
 

 ¶ 11. When Patton developed as a person of interest on September 22, a BOLO ("be on the lookout") was issued. That same day, Vicksburg police spotted Patton's vehicle parked on Washington Street. As authorities approached the vehicle, Patton appeared, and he was arrested. Patton initially gave authorities Alfred's address as his residence, but in a subsequent interview, Patton claimed his address was 3133 Washington Street, the location where authorities found Patton's vehicle parked.
 

 ¶ 12. After obtaining a search warrant for Patton's vehicle, authorities found a small spiral notebook inside the vehicle. Written inside the notebook was a "to-do list" which included a list of items: "Clorox, garbage bags, Benadryl, blankets, and towels." Also found in Patton's vehicle was a term life-insurance policy death-benefit quote from Nationwide Insurance for a sixty-three-year-old male.
 

 ¶ 13. Investigators thereafter contacted several insurance companies and subpoenaed information about a term life policy issued by MetLife in the amount of $20,000 on the life of Alfred Patton. The policy was issued September 16, 2015, to Joseph Patton as the beneficiary. The subpoena production included MetLife's recorded telephone conversations with the party who had purchased the policy and showed the initial premium was paid with the same debit card found in the shorts recovered from Alfred's home. Also produced were records sent to an email address, purportedly Patton's.
 

 ¶ 14. When Patton was arrested on September 22, authorities seized a cell phone in his possession. Investigators obtained a search warrant for the phone's records and data. Investigators found a text message dated September 16 from MetLife thanking the recipient for signing up for texts.
 

 ¶ 15. At trial, Patton testified he moved in with Alfred after moving back from Texas, and that he paid Alfred $75 a week in rent. He said he did not have a bedroom in Alfred's trailer and slept on the couch. Patton said he got along with Alfred. But when Alfred drank, Alfred wanted to be left alone and would ask Patton to leave, which is what occurred on Thursday, September 17. Patton said there was no argument and he complied with Alfred's request, leaving before the end of the football game they were watching to go stay with a friend in Vicksburg. Patton denied ever going back to Alfred's house after Thursday night.
 

 ¶ 16. Patton denied killing Alfred. He said the athletic shorts belonged to Alfred and were found in one of the rooms in which Alfred slept. Patton said he did not know whose debit card was found in the
 shorts, but he had a debit card and Alfred had another. Patton said he and Alfred shared a third debit card, which according to Patton was the card used to buy the ax.
 

 ¶ 17. Patton said his papers were in Alfred's shorts because Alfred always got the mail. And regarding the powder found in the shorts and the substance in the gin, Patton said Alfred often took something to help him sleep.
 

 ¶ 18. Patton admitted buying the bleach, which he used for cleaning the home and doing the laundry. Patton also admitted to buying the ax because Alfred had asked him to chop down a tree in the yard to cover a week's rent.
 

 ¶ 19. Patton claimed the notebook found in his vehicle belonged to Alfred, who frequently used Patton's vehicle. Patton said he did not know whose handwriting was in the notebook, but it was not his (Patton's).
 

 ¶ 20. Patton also said that he never applied for any life insurance, and he did not know whose voice was on the phone recordings obtained from MetLife, but it was not his. Patton also told the jury that he often let Alfred use his email address, which he and Alfred shared. Patton admitted the cell phone found in his possession was his, but Alfred used the phone also because he did not have a home phone.
 

 ¶ 21. Patton was found guilty of murder. He appeals his murder conviction, claiming one assignment of error: his trial was rendered unfair by the trial court's denial of a request to strike for cause two prospective jurors who each said they knew Alfred's son.
 

 ¶ 22. Additional facts will be related as necessary in our discussion of Patton's claim.
 

 DISCUSSION
 

 Whether Patton's trial was rendered unfair by trial court's refusal to strike for cause two prospective jurors who said during voir dire examination they knew the decedent's son.
 

 ¶ 23. The record shows that, during voir dire, when asked by defense counsel whether anyone knew certain members of the Patton family, potential jurors Cedric Wyatt, juror number 153, and a Mr. Carter, juror number 139, both advised they knew the decedent's son, Alfred Jr.
 

 ¶ 24. Wyatt said he used to work with Alfred Jr., and Wyatt's brother was friends with Alfred Jr. Defense counsel asked Wyatt, "Would you have a problem-would it cause you some problem to sit here?" Wyatt answered, "No."
 

 ¶ 25. Carter said, "Yeah, I worked with Alfred [Jr]." Defense counsel commented, "Well, you're going to have to face him at work again, correct, when you go back to work?" Carter indicated affirmatively. Defense counsel then asked, "Would it cause you some problems, how you voted in this case, if you saw him again?" Carter replied, "You'd have to ask him that." Defense counsel said, "No. I mean cause you problems." Carter replied, "No."
 

 ¶ 26. After voir dire examination, defense counsel requested that Wyatt and Carter be removed for cause. The trial court denied both requests. Carter thereafter was struck with the defense's last peremptory challenge, and Wyatt ended up on the jury after the defense had exhausted its peremptory challenges.
 

 ¶ 27. We point out that the record shows there was some confusion on Patton's part during jury selection. According to the record, Patton participated in the selection process with his attorney assisting. After the State tendered twelve jurors, Patton struck the first eight chosen by the State, at which point Patton's attorney said, "You don't get but 12." Patton indicated that he
 did not understand. The trial court then explained to Patton how the process worked.
 

 ¶ 28. Afterward, Patton elected to accept the last juror he had previously struck with his eighth peremptory challenge, and the trial court allowed Patton to do so. The selection process continued, and Patton used his last peremptory challenge to strike Carter.
 

 ¶ 29. Patton contends on appeal that there was an implied prejudice in this instance which the trial court should have recognized and acted upon, striking both potential jurors for cause. Citing
 
 Scott v. Ball
 
 ,
 
 595 So.2d 848
 
 (Miss. 1992), and other cases, Patton submits this Court has indicated that not only is implied prejudice present in cases where a close relationship between jurors and parties or witnesses, but there is a presumption of impaired impartiality also is present in such instances. Patton thus contends it was error for the trial court to refuse the challenges for cause as to Wyatt and Carter because of the presumption of prejudice and other factors. Accordingly, Patton requests a new trial.
 

 ¶ 30. We disagree. "[U]nder Mississippi law, any person not disqualified under Mississippi Code Annotated Section 13-5-1, who will make oath that he or she is impartial, is competent to sit as a juror in a criminal case."
 
 Archer v. State
 
 ,
 
 986 So.2d 951
 
 , 958 (Miss. 2008) (citing
 
 Miss. Code Ann. § 13-5-79
 
 (Rev. 2002) ). "The trial judge whose duty is to see that a competent, fair, and impartial jury is empaneled, is empowered with broad discretion to determine whether a prospective juror can be fair and impartial-notwithstanding the juror's admission under oath that he or she will be."
 

 Id.
 

 at 958-59
 
 . This Court has held that "a juror who may be removed on challenge for cause is one against whom a cause for challenge exists that would likely [a]ffect his competency or impartiality at trial."
 
 Evans v. State
 
 ,
 
 725 So.2d 613
 
 , 653 (Miss. 1997). Whether a potential juror can be fair and impartial is a judicial question reserved for the trial judge and will not be disturbed unless clearly wrong.
 
 Archer
 
 ,
 
 986 So.2d at
 
 957 (citing
 
 Dennis v. State
 
 ,
 
 555 So.2d 679
 
 , 682 (Miss. 1989) ;
 
 Walls v. State
 
 ,
 
 371 So.2d 411
 
 , 413 (Miss. 1979) ). "No general rule can be stated which would control every conceivable situation with respect to a juror's qualifications[; e]ach case must be decided on its own merits in light of the facts before the court."
 
 Walls
 
 ,
 
 371 So.2d at
 
 413 (citing
 
 Odom v. State
 
 ,
 
 355 So.2d 1381
 
 (Miss. 1978) ). We also reiterate this Court's rule "that no reversible error results when the trial court fails to sustain a challenge for cause, and the juror(s) at issue is ultimately excused with a peremptory challenge."
 
 Sewell v. State
 
 ,
 
 721 So.2d 129
 
 , 135 (Miss. 1998).
 

 ¶ 31. At the outset, we note the case
 
 Bell v. State
 
 ,
 
 725 So.2d 836
 
 (Miss. 1998). There, the defendant, convicted of capital murder, claimed the trial court had erred in denying his challenges for cause as to five jurors because of their relationships to the victim or to law enforcement.
 

 Id.
 

 at 845
 
 . The first potential juror's husband was a retired police officer, and the juror had worked with the victim's mother for about six months.
 

 Id.
 

 The second potential juror's father had been a deputy sheriff.
 

 Id.
 

 The third potential juror had a business relationship with the victim's father, and while doing business with the father-who knew the juror had been selected to be on the panel-was told by the father he was glad he (third potential juror) had been selected, because "we need good jurors."
 

 Id.
 

 The fourth potential juror's wife knew the victim's mother through work and also went to church with the victim.
 

 Id.
 

 The juror also had sent a card to the victim's
 family after the victim's death.
 

 Id.
 

 The fifth potential juror owned an auto-parts business where the victim's father had done some business over the years, and had hunted with the father occasionally.
 

 Id.
 

 at 845-46
 
 .
 

 ¶ 32. The trial court in
 
 Bell
 
 declined to excuse any of the five potential jurors for cause, and the defendant used five of his allotted twelve peremptory challenges to strike them. The defendant claimed on appeal the trial court's decision essentially deprived him of the full twelve peremptory challenges allowed because it compelled the defendant to use five of the twelve on those who should have been excused for cause. The
 
 Bell
 
 Court rejected this claim.
 

 ¶ 33.
 
 Bell
 
 first reiterated the wide discretion a trial judge has in determining whether to excuse prospective jurors for cause. Next, in finding the trial court did not abuse its discretion,
 
 Bell
 
 noted
 
 Mhoon v. State
 
 ,
 
 464 So.2d 77
 
 , 81 (Miss. 1985),
 
 superseded by statute on other grounds, see
 

 Bevill v. State
 
 ,
 
 556 So.2d 699
 
 , 713 (Miss. 1990). In
 
 Mhoon
 
 , this Court reversed a defendant's capital murder conviction where twelve members of a thirty-nine member jury pool either were policemen or were related by blood or marriage to current or former members of law enforcement; also, a uniformed policeman served as foreman of the jury.
 
 Mhoon
 
 found that a "statistical aberration" had occurred with the jury pool, and the "unique factual situation" of the "unusual case" before it manifested "too great a risk" of potential "undue influence over the opinions of other jurors ...."
 
 Bell
 
 pointed out that, while
 
 Mhoon
 
 had found a significant problem with the jury pool which necessitated reversal of the defendant's conviction, the
 
 Mhoon
 
 Court also stated, "there is no reason why an officer or an officer's relative should not serve on a jury if otherwise qualified to follow the law and the evidence."
 
 Bell
 
 , 725 So.2d at 846 (quoting
 
 Mhoon
 
 ,
 
 464 So.2d at
 
 81 ).
 

 ¶ 34. The
 
 Bell
 
 Court, addressing those potential jurors who had "disclosed acquaintances and business relationships with relatives of the deceased[,]" found that each one had "declared, under oath, that their relationships would not prevent them from following the court's instructions and applying it fairly to the facts of the case."
 

 Id.
 

 Bell
 
 added:
 

 While the judge's voir dire may not have probed as deeply as Bell thinks the questions should have into these jurors' ability to try the case fairly, Bell, of course, had the opportunity to pursue any questions through his attorney's examination of the jurors. He did not choose to do so.
 

 Id.
 

 Bell
 
 said, "Mere acquaintance or even family relationships with parties or those related to parties is not sufficient to require that a juror be excused for cause."
 
 See
 

 id.
 

 (citing
 
 Rush v. State
 
 ,
 
 278 So.2d 456
 
 (Miss. 1973) (in which this Court found no error in the trial court's decision not to excuse for cause a prospective juror who knew the defendant and had obtained a money judgment against him, when the prospective juror stated he could put the relationship out of his mind and try the case on the facts and the law) ).
 

 ¶ 35. We find that to be the case here. The relationship(s) and/or association(s) disclosed by Wyatt and Carter with the victim's son were not-on this record-enough to say the trial court should have excused either prospective juror for cause. The record does not tell us what type of working or employment relationship either prospective juror had (previously or presently)
 
 [1]
 
 with the son, as there was no further
 inquiry into either matter beyond that related above. But any fault with this omission, as
 
 Bell
 
 instructs, does not lie with the trial court. The record clearly illustrates that the defense could have examined these relationships further if it had chosen to do so.
 
 See, e.g.
 
 ,
 
 id.
 
 at 846.
 

 ¶ 36. Further,
 
 Scott
 
 and the other cases Patton relies upon on appeal are distinguishable. In
 
 Scott
 
 , this Court reversed for a new trial a medical-malpractice judgment in favor of a doctor after finding that
 
 Batson
 

 [2]
 
 violations had occurred with the jury selection process.
 
 Scott
 
 ,
 
 595 So.2d 848
 
 . While
 
 Scott
 
 also found error in the trial court's failure to exclude a potential juror whose family had been treated occasionally by the doctor over a period of ten years,
 
 Scott
 
 did not find this error constituted reversible error, noting at the outset of the opinion that only "the [
 
 Batson
 
 ] issue requires reversal."
 

 Id.
 

 at 849
 
 .
 

 ¶ 37. In addressing the challenge for cause issue,
 
 Scott
 
 said:
 

 To the extent that any juror, because of his relationship to one of the parties, his occupation, his past experience, or whatever, would normally lean in favor of one of the parties, or be biased against the other, or one's claim or the other's defense in the lawsuit, to this extent, of course, his ability to be fair and impartial is impaired.
 

 Id.
 

 Scott
 
 , however, coupled this statement with the following:
 

 It should also be borne in mind that jurors take their oaths and responsibilities seriously, and when a prospective juror assures the court that, despite the circumstance that raises some question as to his qualification, this will not affect his verdict, this promise is entitled to considerable deference.
 
 Harding v. Estate of Harding
 
 ,
 
 185 So.2d 452
 
 , 456 (Miss. 1966) ;
 
 Howell v. State
 
 ,
 
 107 Miss. 568
 
 , 573,
 
 65 So. 641
 
 , 642 (1914).
 

 595 So.2d at 849
 
 .
 

 ¶ 38.
 
 Scott
 
 cautioned that in cases in which a physician is a party, the trial court "must be sensitive to the qualification of a juror" who has been treated by him or her, "or whose family members have at one time or another been patients" of his or hers, especially in smaller towns and less populated areas.
 

 Id.
 

 Scott
 
 explained, "Mississippians in less populated areas enjoy a close, fraternal relationship with their doctors, and regardless of a prospective juror's complete sincerity in his belief of his ability to be fair, it is only human nature that in most cases he will be more reluctant to return a verdict against the physician."
 

 Id.
 

 at 851
 
 .
 

 ¶ 39. We do not find the same type of intimate or personal relationship here.
 

 ¶ 40. In
 
 Taylor v. State
 
 ,
 
 656 So.2d 104
 
 (Miss. 1995), upon which Patton also relies, this Court held the trial court erred in refusing to remove for cause the brother of an assistant district attorney who worked in the office of the district attorney prosecuting the case against the defendant. The brother was selected as a juror in the case after the defendant already had exercised all of the peremptory challenges allotted.
 

 Finding the issue as one of first impression, the
 
 Taylor
 
 Court cited as persuasive authority
 
 People v. Macrander
 
 ,
 
 828 P.2d 234
 
 , 242 (Colo. 1992), which states:
 

 [A] prospective juror who is related within the third degree by blood, adoption, or marriage to a deputy district attorney presently serving on the staff of the elected district attorney responsible for the criminal prosecution is related to an "attorney of record" for purposes of a challenge for cause....
 

 Id.
 
 at 110.
 
 Taylor
 
 reiterated that, "[o]ne of the purposes of challenges, for cause and peremptory, is to eliminate jurors who have expressed or implied prejudices, or who may be put in an embarrassing position despite protestations to the contrary."
 
 Id.
 

 Taylor
 
 said, "[c]ertainly, a juror who is the brother of an assistant district attorney is in such a position[,]" and that "he is close to his sister and is her neighbor makes the problem more acute."
 
 Id.
 
 at 111. Accordingly, this Court held that the trial court in
 
 Taylor
 
 erred in not excusing that particular juror for cause.
 

 ¶ 41. But as with
 
 Scott
 
 , the type of relationship found in
 
 Taylor
 
 is not found here.
 

 ¶ 42. Lastly, Patton cites
 
 Poe v. State
 
 ,
 
 739 So.2d 405
 
 , 409 (Miss. Ct. App. 1999), in which the defendant had claimed on appeal that the trial court's decision to exclude certain veniremen had a "
 
 Batson
 
 -like effect." Rejecting the claim, the Court of Appeals first pointed out that
 
 Batson
 
 claims involve peremptory challenges, not excusals for cause.
 

 Id.
 

 at 409
 
 . The Court of Appeals next found no abuse of discretion in the trial court's decision to remove for cause a potential juror who went to school with the defendant, was friends with the defendant's brother, and whose best friend had dated the defendant.
 

 Id.
 

 Poe
 
 also found no abuse of discretion in the trial court's decision to remove a potential juror whose son was a first cousin to the defendant.
 

 Id.
 

 ¶ 43. That
 
 Poe
 
 found no abuse of discretion in the trial court's decision(s), simply goes to the Court of Appeals' limited standard of review with regard to such matters.
 
 See again
 
 ,
 
 Walls
 
 ,
 
 371 So.2d at 413
 
 ("No general rule can be stated which would control every conceivable situation with respect to a juror's qualifications[; e]ach case must be decided on its own merits in light of the facts before the court.").
 

 ¶ 44. For our purposes here, there was no showing that either prospective juror had a close personal relationship with the victim's son, just that they had worked together, and that Wyatt's brother was friends with the son. Consistent with
 
 Bell
 
 , and not inconsistent with either
 
 Scott
 
 ,
 
 Taylor
 
 , or
 
 Poe
 
 , the relationships disclosed here are, by themselves, insufficient to disturb the trial court's judgment that both prospective jurors on their oaths could be impartial in Patton's trial.
 

 ¶ 45. For these reasons, Patton's claim that the trial court erred by failing to strike Carter and Wyatt for cause, is without merit.
 

 CONCLUSION
 

 ¶ 46. We affirm Patton's conviction and sentence for murder.
 

 ¶ 47.
 
 AFFIRMED.
 

 RANDOLPH, P.J., COLEMAN, MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND KING, J.
 

 It is not clear from the record whether Wyatt or Carter currently were working with the victim's son at the time of trial. Based on their initial responses, both prospective jurors seemed to say they had worked with victim's son in the past. Although, when asked by defense counsel about having to face the son when Carter returned to work, Carter indicated that would be the case.
 

 See
 

 Batson v. Kentucky
 
 ,
 
 476 U.S. 79
 
 ,
 
 106 S.Ct. 1712
 
 ,
 
 90 L.Ed.2d 69
 
 (1986) (holding that the Equal Protection Clause forbids the government from exercising peremptory challenges to exclude jurors on account of their race); and
 
 Edmonson v. Leesville Concrete Co.
 
 ,
 
 500 U.S. 614
 
 ,
 
 111 S.Ct. 2077
 
 ,
 
 114 L.Ed.2d 660
 
 (1991) (holding that
 
 Batson
 
 principles apply to civil cases between private litigants).