# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-KA-00434-SCT

*CHARLES E. BLAKE a/k/a CHARLES BLAKE*
*a/k/a CHARLES EDWARD BLAKE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/02/2015 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| TRIAL COURT ATTORNEYS: | ROSHARWIN LEMOYNE WILLIAMS |
| | KIMBERLY DENICE McCRAY |
| | AZKI SHAH |
| | KEVIN BRIAN BASS |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: HUNTER NOLAN AIKENS |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALICIA MARIE AINSWORTH |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/04/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. Charles Blake was convicted of sexually battering a seven-year-old child during a family barbeque. He was sentenced to life in prison. On appeal, Blake argues the judge made several evidentiary errors that entitle him to a new trial. But after review, we find no

errors, particularly none that warrant reversal. The evidence that Blake sexually penetrated Robert's[1] anus with his finger—or, as the young child put it, dug "in his butt"—was so overwhelming as to render any alleged evidentiary error harmless. We affirm.

**Background Facts and Procedural History**

### I. Sexual Battery

¶2. Seven-year-old Robert lived with his mother and older sister at his grandmother's house. On Labor Day, his grandmother hosted a barbeque. Included in this family gathering were the grandmother's boyfriend and the boyfriend's brother, Charles Blake. Blake ingratiated himself with the other guests, buying alcohol for the grown-ups and taking the kids to the store to buy treats with the $5 each he gave them. According to Robert, Blake made a separate proposal to him, specifically offering the child an additional $100 to visit Blake at his house.

¶3. Robert's uncle, who was manning the grill, told his and his sister's kids to play inside, so the grown-ups could enjoy some adult conversation. While the kids were playing inside, Blake entered the home. Robert's cousins and sister were in the dining room, all sitting on a couch. At first, they did not notice Robert was not with them. But a bit later, his teenaged cousin looked into the adjacent living room and saw Blake in a chair with Robert standing in front of him. This same cousin wondered aloud what Blake was doing with Robert because she saw Blake "pulling [Robert] back and forth." When Robert's sister turned her

---

[1] We have substituted a fictitious name for the child victim.

2

attention to the living room, she too saw Blake physically moving Robert back and forth. From the strange look on Robert's face, she knew something was wrong.

¶4. The two girls jumped up and went toward Robert. He quietly whispered for his sister and cousin to "go get ma." His sister went straight to their mother, who was in her bedroom. She told her something was wrong with Robert. His mother called to him several times. Robert eventually emerged from the table. He was shaking and had tears in his eyes. Robert had a terrified look on his face—an expression his mother had never seen before. The young child told his mother and sister that Blake had been "in there digging in my butt."

¶5. Robert's mother testified she blacked out in shock by this news. Witnesses corroborated that she grabbed a bottle and charged toward Blake. On the witness stand, she readily admitted becoming enraged and attacking Blake. Blake ran out of the house. And Robert's mother called the police, who advised her to take Robert to the hospital.

## II. Investigation

¶6. Police Sergeant Norman Starks met the family at the hospital and interviewed the mother. Afterwards, he went to the grandmother's house to view the crime scene and gather a list of witnesses.

¶7. The next day, Blake and his brother came to the police station for questioning. Blake told him he had left his bag behind when he fled from Robert's enraged mother. And he asked for Sergeant Starks's help to get it back. Robert's uncle had the bag and agreed to drop it off at the police station. Before returning the bag to Blake, Sergeant Starks opened the bag and inventoried its contents in front of Blake and Blake's brother, apparently without

3

any objection. On top of all items in the bag was a tube of "Warm Touch" warming gel lubricant. Sergeant Starks told Blake he would have to retain the tube as potential evidence. He photographed the rest of the items—including several latex gloves—and returned the bag to Blake.

¶8. The next month, Sergeant Starks took Robert to a forensic specialist trained in interviewing children. Robert told the interviewer how Blake had touched his buttocks. When she asked him to explain what he meant by "touched," Robert demonstrated to her how Blake's "finger wiggled inside his buttocks and his buttocks hurt."

### III. Trial

¶9. Blake was charged with sexually penetrating Robert, a child under the age of fourteen, by inserting his finger into Robert's anal opening, when Blake was more than twenty-four months older than Robert. *See* Miss. Code Ann. § 97-3-95(1)(d) (Rev. 2014).

¶10. The Friday before trial, Blake moved for a continuance, arguing he needed more time to locate a potential witness—Dr. Jeffrey Ming, the emergency room physician who evaluated Robert that night. The trial court denied this motion. The court found Blake's counsel could not show any diligent efforts to locate Dr. Ming, though Blake had been under indictment for more than two years.

¶11. At trial, Sergeant Starks testified first. While he was testifying, the State introduced—over Blake's objection—the photographs of the contents of his bag and the tube of warming gel lubricant.

4

¶12.    Robert's mother and sister also testified.  Both were allowed, under the tender-years exception, to testify about Robert's statements immediately after the assault.  *See* Miss. R. Evid. 803(25).  The two repeated that Robert had said Blake was "digging in my butt."  The forensic interviewer also testified about Robert's description of Blake's fingers wiggling in his butt.  Robert's sister recounted seeing Blake physically manipulating Robert, back and forth.  She recalled the strange look on Robert's face.  And Robert's cousin corroborated that Blake, with his hand behind Robert's back, was pulling the child back and forth.  Robert's other cousin testified that he was "certain" he saw Blake's hand inside Robert's pants.

¶13.    The jury then heard from Robert himself.  He recounted how Blake "put his hand in my butt."  On cross-examination, when asked at what point he whispered to his cousin for help, Robert replied "when [Blake] was digging in my butt."

¶14.    The defense called no witnesses. Robert's counsel attempted to recall Sergeant Starks to impeach Robert's mother.  But the State objected.  The trial judge sustained the objection.

¶15.    Blake's counsel did introduce Robert's medical records from his emergency-room visit.   But the trial court struck the emergency-room doctor's diagnosis—"alleged fondling"—because, in the court's view, the description of fondling "may be misleading or confusing to the jury."

¶16.    The jury found Blake guilty of sexual battery.  And the trial judge sentenced Blake, a habitual offender, to life without parole.  *See* Miss Code Ann. § 97-3-101(3) (Rev. 2014); Miss. Code Ann. § 99-19-83 (Rev. 2015).

## IV.    Issues on Appeal

¶17. After his post-judgment motions were denied, Blake appealed his conviction to this Court. Blake argues:

(1) The trial court violated his Sixth Amendment right to present a complete defense by:

  (a) denying his request to recall Sergeant Starks to impeach Robert's mother,

  (b) denying his request to continue trial so he could locate the emergency room doctor, and

  (c) redacting the doctor's diagnosis from Robert's medical records.

(2) The trial court erred by admitting tender-years testimony.

(3) The trial court erred by admitting into evidence the contents of Blake's bag.

## Discussion

### I.  Blake's Defense

¶18. Blake suggests a series of trial-court rulings infringed on his constitutional right to present a full defense in his case. *See **Ross v. State***, 954 So. 2d 968, 996 (Miss. 2007) (citing ***United States v. Stewart***, 104 F.3d 1377, 1384 (D.C. Cir. 1997)). But we discern no error.

#### A.  *Attempted Recall of Sergeant Starks*

¶19. Blake first asserts he was wrongly prohibited from impeaching the credibility of Robert's mother. Blake claims her credibility was an important aspect of his defense because it was she who, through the tender-years exception to the hearsay rule,[2] testified Robert told her Blake had been "digging in my butt."

---

[2] *See infra* Discussion § II.

¶20.    While Blake was certainly entitled to present his defense theory, any supporting evidence must comply with the Mississippi Rules of Evidence. ***Terry v. State***, 718 So. 2d 1115, 1121-22 (Miss. 1998).   Rule 613 permits the admission of "[e]xtrinsic evidence of a witness's prior inconsistent statement" if certain conditions are met. Miss. R. Evid. 613(b).

¶21.    Blake argues the trial court wrongly believed Blake's failure to confront Robert's mother with her prior statement barred Blake from recalling Sergeant Starks to offer extrinsic evidence about the statement.   In one respect, we agree with Blake's argument about this ruling.

¶22.    In the past, Mississippi adhered to the former rigid common-law practice, requiring confrontation before impeachment.[3]   This impeachment method mandated that, before an attacking party may offer extrinsic evidence of an inconsistent statement, the witness must be confronted with the statement and be given a chance to explain or deny it.   But this is no longer the case in Mississippi courts.[4]   Indeed, this Court has held that under Rule 613(b),

---

[3] ***The Queen's Case*** (1820) 129 Eng. Rep. 976; 2 Br. & B. 284 (HL) (before statement is proved, witness must be asked on cross-examination whether he made it; if he admits it, proof becomes unnecessary and witness can explain; if he denies it, attacking party can "contradict and falsify" by extrinsic evidence).

[4] The common law "confront first, then admit or deny" mandate, while recognized for some time in Mississippi, is not grounded in either Mississippi Rule of Evidence 613(b) or its federal equivalent.  Indeed, the Advisory Committee Note to Rule 613 emphasizes that the confrontation rule from the ***The Queen's Case*** is now *abolished* in Britain and in federal courts, though it "lingered" for some time in Mississippi.  There is no mandate as to *when* the extrinsic evidence may be admitted.  The only requirements are that, at some point, the witness be given an *opportunity* to explain or deny the statement and that opposing counsel is given an *opportunity* to examine the witness about it.  The Advisory Committee Note to Rule 613 explains the foundation requirement in ***The Queen's Case*** was modified:

Subdivision (b) preserves the foundation requirement in ***The Queen's Case***

extrinsic evidence may be offered *before* a witness has had an opportunity to explain or deny it. In ***Johnson v. State***, this Court explained, "[Rule] 613(b) does not provide that the witness has to first be afforded the opportunity to explain or deny the statement *before* the admission of extrinsic evidence of a prior inconsistent statement by a witness." ***Johnson v. State***, 905 So. 2d 1209, 1212-13 (Miss. 2005) (emphasis added) (citing Miss. R. Evid. 613(b)). "The witness must only be afforded the opportunity to explain or deny the statement." ***Id.***; *see also* ***Portis v. State***, 245 So. 3d 457, 471 (Miss. 2018). So prior confrontation is no longer required under our procedure rules,[5] and it was not required here. Still, after review, we find there was no evidentiary error because there was no admissible prior inconsistent statement for Rule 613(b) purposes.

¶23. To be admissible under Rule 613(b), the extrinsic evidence must be a "witness's prior *inconsistent* statement." Miss. R. Evid. 613(b) (emphasis added); *see also* ***Portis***, 245 So.

---

with some modifications when impeachment is by extrinsic evidence. The traditional insistence that the attention of the witness be directed to the statement on cross-examination is relaxed in favor of simply providing the witness an opportunity to explain and the opposite party an opportunity to examine the statement, *with no specification of any particular time or sequence.*

Miss. R. Evid. 613(b) advisory committee note (emphasis added).

[5] Rule 613(b) expressly provides:

**Extrinsic Evidence of a Prior Inconsistent Statement.** Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subdivision (b) does not apply to an opposing party's statement under Rule 801(d)(2).

3d at 471. And here, the police statement Blake wanted to introduce through Sergeant Starks was *not* inconsistent with Robert's mother's trial testimony. Instead, Blake hoped to shoehorn his impeachment of the child witnesses' testimony by attacking a statement made by Robert's mother.

¶24. Blake's counsel proffered that Sergeant Starks would testify that, when he interviewed Robert's mother at the emergency room, "she specifically stated that none of the children indicated to her that they knew anything or saw anything." This statement is not inconsistent with her trial testimony. On cross-examination, counsel asked Robert's mother:

> Q:   Now, prior to [hitting Blake], did you make any attempt to talk to any of the kids to ask them what they saw supposedly?
>
> A:   No, I did not. The look on my son's face told it all.
>
> Q:   Did you tell Mr. Starks that you had talked to those kids after you had attacked Mr. Blake?
>
> A:   No.
>
> Q:   Did you tell Mr. Starks that the children that you talked to told you that they didn't see anything?
>
> A:   No, I did not.

Both the statement and trial testimony can certainly be true. Telling Sergeant Starks that none of the children specifically mentioned to her that they saw anything differs from reporting that each child who was present affirmatively told her he or she did not see Blake assault the child.

¶25. Furthermore, that Blake sought to introduce the statement to show Robert's mother reported that *the children* had said they did not see anything shows Blake's true intent. He

9

did not intend to impeach the mother, but rather to attack the *children*'s trial testimony about what they purportedly saw Blake do. Because the extrinsic evidence Blake proffered was not proper impeachment evidence, the trial judge did not reversibly err by prohibiting Sergeant Starks from being recalled.

### B. Motion for Continuance to Locate Dr. Ming

¶26. Blake also claims the trial court erred in denying him a continuance to attempt to find Dr. Ming to testify as an expert witness.

¶27. "The grant or denial of a continuance lies within the sound discretion of the trial court." *Wilson v. State*, 716 So. 2d 1096, 1097 (Miss. 1998) (citations omitted). Here the denial of the continuance was based on Blake's failure to show due diligence in trying to locate Dr. Ming. As the trial judge recognized, "in the context of a denied motion for continuance for absence of a witness some showing of due diligence must be made." *Wilson v. State*, 716 So. 2d 1096, 1099 (Miss. 1998). And the record shows "no effort on the part of the defendant to procure the presence of the witness until the trial . . . was practically in progress." *Id.* (quoting *Thigpen v. State*, 206 Miss. 87, 39 So. 2d 768, 769 (1949)). Blake concedes he did not subpoena Dr. Ming or move for a continuance until the Friday before trial. So the trial court "was well within [its] discretion to deny [Blake's] untimely motion for a continuance." *Id.*

### C. Redacted Medical Diagnosis

¶28. Blake also takes issue with the judge's redacting the diagnosis of "alleged fondling" from Robert's emergency-room records, which were admitted into evidence.

¶29. The suppression of evidence is within the sound discretion of the trial court. **Brown v. State**, 890 So. 2d 901, 914 (Miss. 2004). And here, the trial judge exercised his discretion to exclude the phrase "alleged fondling" because it potentially could confuse the jury. The trial court was concerned the jury could be misled to think Dr. Ming was using the term "fondling" in the *legal* sense. There was no indication Dr. Ming understood that "fondling" was a specific statutory crime that differed from the charged crime of "sexual battery." *See* Miss. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues[ or] misleading the jury[.]").

¶30. Blake argues the trial court erred because "[a]n opinion is not objectionable just because it embraces an ultimate issue." Miss. R. Evid. 704. While Blake is correct that Rule 704 abolished the "ultimate issue rule," the abolition of this rule "does not result in the admission of all opinions." Miss. R. Evid. 704 advisory committee note. As absolutely required under Rules 701 and 702, "opinions must be helpful to a determination of the case before they are admissible." *Id.* And an opinion "based on inadequately explored legal criteria" would not be helpful. *Id.*

¶31. The trial court determined Dr. Ming's "alleged fondling" diagnosis would not be helpful to the jury, because it was uncertain if Dr. Ming understood the *legal* meaning of "fondling." *Cf. McBeath v. State*, 739 So. 2d 451, 455 (Miss. Ct. App. 1999) (noting that a medical expert could use the legal label "serious bodily injury" so long as "the witness had the meaning of the term explained"). The medical records give zero indication the legal

11

criteria of the statutory crime of fondling—as opposed to sexual battery—had been explained before Dr. Ming diagnosed Robert with "alleged fondling." So the trial court did not abuse its discretion by excluding the diagnosis as misleading to the jury. *See* Miss. R. Evid. 403.

## II. Tender-Years Exception

¶32. Next, Blake insists the trial judge wrongly permitted Robert's mother, Robert's sister, and the forensic interviewer to testify about what Robert told them. In general, statements made outside the court submitted to prove the truth of the matter asserted are inadmissble hearsay. Miss. R. Evid. 801, 802. But our rules do contain several exceptions, including the one the trial court applied here.

¶33. Under Rule 803(25), "[a] statement by a child of tender years describing any act of sexual contact with or by another is admissible if" two prerequisites are met:

> (A)  the court—after a hearing outside the jury's presence—determines that the statement's time, content, and circumstances provide substantial indicia of reliability; and
>
> (B)  the child either: (i) testifies; or (ii) is unavailable as a witness, and other evidence corroborates the act.

Miss. R. Evid. 803(25).

¶34. Blake challenges the first prerequisite. He asserts the record does not affirmatively show the trial court made on-the-record findings that Robert's statements had substantial indicia of reliability. *See* Miss. R. Evid. 803(25) advisory committee note ("A finding that there is a substantial indicia of reliability should be made on the record."). When Blake submitted his brief, the appellate record did not contain a transcript of the tender-years hearing. But the record was subsequently supplemented to include this transcript. And this

transcript clearly shows the trial court made thorough on-the-record findings about why Robert's statements were reliable.

¶35. Although we gave Blake an opportunity to file a supplemental brief, he advanced no further arguments on this issue. Because the record supports the trial court's ruling that the tender-years exception applies, the judge did not abuse his discretion by allowing other witnesses to testify about Robert's description of Blake's sex act.

### III.    Blake's Bag

¶36. Finally, Blake asserts the trial court erred in admitting the contents of his bag.

### A.    *Legality of the Search*

¶37. Blake first challenges the admission on Fourth Amendment grounds. U.S. Const. amend. IV. Blake claims Sergeant Starks's warrantless search of Blake's bag violated his Fourth Amendment rights, making the bag's contents inadmissible "fruit of the poisonous tree." *See Marshall v. State*, 584 So. 2d 437, 438 (Miss. 1991) (citing *Murray v. United States*, 487 U.S. 533, 536, 108 S. Ct. 2529, 2533, 101 L. Ed. 2d 472 (1988)) (explaining the "fruit of the poisonous tree" doctrine—also known as the exclusionary rule—deems inadmissible any evidence obtained incident to an unlawful search or seizure). But the Fourth Amendment prohibits *unreasonable* searches. *South Dakota v. Opperman*, 428 U.S. 364, 373, 96 S. Ct. 3092, 3099, 49 L. Ed. 2d 1000 (1976). And here, there was nothing unreasonable about Sergeant Starks's inventory search of Blake's bag.

¶38. To begin with, any expectation of privacy Blake may otherwise have enjoyed disappeared when Blake told Sergeant Starks about the bag he left at the crime scene and

13

willingly enlisted the officer's help in getting it back. *Cf. Gales v. State*, 153 So. 3d 632, 639 (Miss. 2014) (citing *Katz v. United States*, 389 U.S. 347, 359, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J. concurring) (holding that a defendant who voluntarily showed the money in his pocket to the officer who stopped him "no longer had a 'reasonable expectation of privacy' as to the money under the Fourth Amendment"). Further, Sergeant Starks had a legitimate purpose in conducting the inventory search. The bag was delivered into Sergeant Starks's care, while Blake was at the police station for questioning. And Sergeant Starks testified he followed standard police procedure. He opened the bag and catalogued its contents in front of Blake, with no apparent objection, "to make sure that the contents in the bag was [sic] the exact contents that [Blake] knew to be his." This was done so Blake could not claim any items were taken.

¶39. The United States Supreme Court has "found that inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372, 107 S. Ct. 738, 741, 93 L. Ed. 2d 739 (1987) (discussing *Opperman*, 428 U.S. 364). "In light of these strong governmental interests and the diminished expectation of privacy," the inventory search of Blake's bag was not unreasonable. *Id.* So the contents of the bag were not "fruit of the poisonous tree."

### B. Admissibility of the Bag's Contents

¶40. Alternatively, Blake argues the trial court erred by admitting the bag's contents—specifically, the tube of "Warm Touch" lubricant and the latex gloves—because

14

these items were irrelevant and, even if relevant, unfairly prejudiced him. *See* Miss. R. Evid. 403.

¶41. We find no error in the admission of the items—particularly no *reversible* error. In general, the decision to admit or suppress evidence falls within the trial judge's discretion and will not be reversed absent an abuse of that discretion. *Townsend v. State*, 847 So. 2d 825, 831 (Miss. 2003). The decision to admit the contents of Blake's duffle bag is no different. As this Court has held, "[i]n an effort to determine the intent of the person charged with [a] crime, it is permissible to show the surrounding circumstances and physical objects used *or useful* in the commission of a crime." *Wilkins v. State*, 264 So. 2d 411, 413 (Miss. 1972) (emphasis added). The determination "as to whether or not [objects] found near the scene of a [crime] are near enough in time and place to be of probative evidentiary value" falls "within the sound discretion of the trial judge." *Id.* at 414. And if the judge determines these objects either have probative value or "constitute a part of the surrounding scene or picture," the objects are admissible—"even where it is not claimed nor proved that they were used in the commission of the alleged crime." *Id.* at 413.

¶42. Relying on *Wilkins*, a plurality of this Court in *Burleson v. State*, 166 So. 3d 499, 508 (Miss. 2015), held the trial judge did not err in admitting the handgun found in the defendant's car the day he was arrested for capital murder with the underlying felony of robbery, even though "the State never argued that the gun was used in the commission of the crime[.]" Similarly, in *Lee v. State*, 944 So. 2d 56, 62 (Miss. Ct. App. 2005), the Mississippi Court of Appeals held the trial judge did not abuse his "great deal of discretion" when he

admitted, in a statutory-rape case, a sex toy and a thong found in the defendant's home, because the items "were part of the complete story of these crimes." *Id.*

¶43. Here, the trial judge found the contents of the bag Blake brought to Robert's grandmother's house that day were near enough in time and place to be part of the complete story of the crime. Thus, they have probative value, even though the State never claimed Blake used the gel and gloves in the sexual battery. *Wilkins*, 264 So. 2d at 413-14; *Lee*, 944 So. 2d at 62. The fact Blake packed a tube of warming gel lubricant and latex gloves for a family barbeque he knew children would attend certainly goes to the relevant question of Blake's intent that day. *Wilkins*, 264 So. 2d at 413. Indeed, this evidentiary scenario is similar to admitting digital scales found in a backpack left behind by a drug trafficker at the scene of a drug deal or burglary tools found in the car of a man caught breaking into a nearby house. In short, this decision fell within the judge's sound discretion, which he did not abuse.

¶44. That same discretion applies to the judge's decision not to exclude this admissible evidence based on Blake's Rule 403 argument. Rule 403 "does not mandate exclusion but rather provides that the evidence *may* be excluded." *Jones v. State*, 904 So. 2d 149, 152 (Miss. 2005) (emphasis in original). "Where a trial court determines that potentially prejudicial evidence possesses sufficient probative value, it is within that court's sound discretion whether or not to admit same." *Id.* While Blake complains the lubricant and gloves were unfairly prejudicial because they "invited the jury to speculate that Blake actually penetrated [Robert's] anal opening," the jury did not have to engage in speculation

to reach the conclusion Blake inserted his finger in Robert's anus. There was ample direct and vivid testimony to support its verdict. So the admission was not error. And, even if it was, based on the overwhelming evidence of Blake's guilt, it was at most harmless.

¶45.    Therefore, we affirm.

¶46.    **AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., COLEMAN, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, JUSTICE, DISSENTING:**

¶47.    The warming gel and latex gloves allowed into evidence are irrelevant, more prejudicial than probative, and their admission was not harmless error.[6]  Accordingly, I respectfully dissent.

¶48.    At trial, the State introduced the contents of Blake's bag/backpack. In particular, the State wanted to introduce warming gel (Warm Touch Warming Jelly) and latex gloves found inside the bag. Blake objected vigorously to the relevance of these objects. Blake noted that not a single witness could tie the bag to the crime, stating that

> not a single witness will testify that they saw Mr. Blake access that bag other than bring the bag over with him when he came to the residence. Not a single witness will testify that he removed anything from that bag prior to the

---

[6]I also take issue with the majority's analysis regarding the prior statement of the mother. I agree with the majority's conclusion that the prior statement was not inconsistent, thus the trial court did not err in declining to recall Officer Stark. However, the majority makes a leap from the facts in the record and opines that Blake's "true intent" was to impeach the testimony of the child witnesses. Such a leap requires many assumptions and is unnecessary to the ultimate conclusion. I disagree with this assumption made by the majority.

17

incident in question. But the proof will show that he brought the bag over, never went inside that bag.

Blake argued that "no one will even testify that Mr. Blake had even opened the bag while he was there." He maintained that engaging in speculation about the gel is prejudicial, and that the gel has no probative value. Blake argued that he carried that bag and sold things out of it. The State argued that the gel was relevant under Rule 404(b) to establish motive, intent, and opportunity. It argued that an internet search by the State indicated that the gel is used for "sexual means" and that it was used as part of an intent, plan, or scheme to engage in sexual battery. It also argued that the item "was in the same room with the child." The State maintained that the gel was relevant and that the probative value trumped any prejudicial effect, "[e]specially, given the fact that we're trying a sexual abuse of a vulnerable individual, a child."

¶49. Sergeant Starks testified before the judge about the preliminary evidentiary issues. He testified that during his interview with Blake, Blake mentioned that he had left a bag at the house, that he had not received it back, and that he wanted it back. Blake mentioned that the bag contained his merchandise. Sergeant Starks asked that Robert's uncle bring the bag to him. Robert's uncle gave Sergeant Starks the bag outside the presence of Blake, so Sergeant Starks took the bag to Blake and opened it in Blake's presence in order to document its contents because he did not want Blake to accuse him of taking something. He stated that he was not searching for evidence, but when he located the warming gel on the top, he took it for evidence. Sergeant Stark stated that he did not have any evidence to connect the gel to the allegations in the indictment.

18

¶50. The court found that the gel was admissible under Rule 404(b) as evidence of motive, opportunity, intent, preparation, plan, and knowledge, and that it was more probative than prejudicial.

¶51. In the presence of the jury, the State asked Sergeant Starks if he was familiar with toothpaste. The following exchange occurred:

Q. Does toothpaste come in a container?

A. Yes, sir. Toothpaste comes in tubes or it comes in cylinders, of course, long cylinders also, but it all – most of the ones I get come in tubes.

Q. Does it come in a box, as well?

A. Yes, sir.

Q. Was this contained in a box even though it was not toothpaste?

A. No, sir, it was not in the box.

The State did not adduce any evidence that this warming gel is normally packaged in a box. Sergeant Starks testified that he did not check the tube to see if it had been opened. The photograph of the tube does not indicate any depressions that would indicate use. The actual tube, which was admitted into evidence, has been retained at the circuit court. The photographs also showed several unpackaged latex gloves (at least ten). No witness testified that those gloves appeared to have been used.

¶52. The bag did not appear in any of Sergeant Starks's many photographs of the home taken the night of September 3, 2012. Sergeant Stark testified that, during his investigation of the house, he did not find any warming gel or latex gloves. He stated that the seat alleged to be the scene of the crime did not appear to be out of order or to have any liquids or foreign

19

substances on it. Robert's mother testified that she never saw Blake bring the bag in the home, and that she only found out about the bag afterward. His uncle's partner testified that Blake had the bag when he arrived. His sister testified that Blake arrived with the bag and placed it in the front room. No witness testified that Blake moved or touched the bag after entering the house.

¶53. During closing arguments, the State mentioned the gel, stating that "what makes its [sic] even more telling is this man shows up with a book bag and in that book bag are latex gloves and jelly." Blake's argument primarily focused on the existence of reasonable doubt as to the element of penetration.

¶54. The trial court found (and the State argued at trial) that the gel and gloves were admissible under Rule 404(b) to show motive, intent, knowledge, and plan. Yet, Rule 404(b) governs evidence of "other crimes, wrongs, or acts." Miss. R. Evid. 404(b). The State did not demonstrate that the gel and gloves were evidence of "other crimes, wrongs, or acts," so Rule 404(b) is inapposite and inapplicable, and the trial court erred in utilizing it to admit the evidence. The State appears to have abandoned the Rule 404(b) argument on appeal, and argues that the evidence was otherwise admissible.[7]

¶55. Rule 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and that fact "is of consequence in determining the case." Miss. R. Evid. 401. "[E]vidence may be introduced as part of the res

[7]The trial court also specifically asked Sergeant Starks: "did [Blake] acknowledge or deny any of those items as being his?" Sergeant Starks replied: "He did not deny that those items were his." Relying on the lack of a denial that the objects were Blake's to determine admissibility may implicate Fifth Amendment concerns.

20

gestae of a crime if it was an inseparable part of the entire transaction." *Collins v. State*, 513 So. 2d 877, 879 (Miss. 1987) (footnote omitted). This Court has also noted that evidence regarding the scene of the crime and objects found at the scene, "*if relevant*, are admissible in evidence if not remote in time and place." *Wilkins v. State*, 264, So. 2d 411, 413 (Miss. 1972) (emphasis added). "In an effort to determine the intent of the person charged with [a] crime, it is permissible to show the surrounding circumstances and physical objects used or useful in the commission of a crime." *Id.* The majority claims that the bag and its contents are part of the *res gestae* of the crime and are relevant to intent. Rule 401 states that evidence must make a fact more or less *probable*. The speculative "intent" the warming gel purports to show is no more likely than any other motive, such as: he was planning on selling the gel as merchandise (it was contained in his merchandise bag), he was planning a rendevous with an adult later, he carried it in case of a chance encounter with an adult, part of his body had chafing problems and he used the gel to lubricate, or many other possible uses that are just as likely, if not more likely, than the intent to commit sexual battery. The majority problematically states that "[t]he fact Blake packed a tube of warming gel lubricant and latex gloves for a family barbeque he knew children would attend certainly goes to the relevant question of Blake's intent that day." Maj. Op. ¶ 43. First, this statement assumes facts not contained in the record: nothing in the record indicates when Blake packed the gel and gloves or why, or that he packed them *for* the barbeque; rather, the record indicates that he always carried this bag and that it contained merchandise that he sold. Second, such a sweeping statement regarding what sort of evidence is probative of intent places every person

21

who carries a condom under suspicion of intent to commit a sexual crime. Not every remote item that might indicate sexual activity is probative of evidence of a crime.

¶56.    The evidence shows only that, at some point on the day of the incident, Blake's bag was on the property. No witness testified that on the day of the crime they saw the contents of the bag, which tended to contain his "merchandise." No evidence exists that the bag or anything in it was used during the crime. No evidence placed the bag in the same room as the crime during the crime. The evidence reveals only that the bag, with unknown contents, was somewhere on the property where the crime occurred sometime on the day of the crime. The same bag was given to Sergeant Starks, closed, the day after the occurrence.

¶57.    In *Collins*, Collins was convicted of sexual battery. *Collins*, 513 So. 3d at 877. The evidence from both Collins and the victim indicated that, immediately prior to the incident, Collins showed the minor victim and her friend one specific pornographic magazine. *Id.* at 878. The specific magazine used prior to the crime was identified. *Id.* During a search of the shed in which the crime occurred, police located six pornographic magazines: the one used during the incident and five others. *Id.* The trial court allowed all six magazines to be admitted into evidence, and the State argued that all six were probative of Collins's lustful motives and his plan for sexual gratification via the alleged battery. *Id.* This Court found that the five magazines not used as part of the crime were not relevant. *Id.* at 879. It noted that "[t]here is no evidence in the record linking the five additional magazines with the alleged sexual battery . . . ." *Id.* It noted that "[t]he only connection between the five magazines and the alleged crime is that the desk in which the magazines were stored was

located inside the shed in which the alleged crime occurred." *Id.* It therefore found that the magazines were not probative of any element of the alleged crime, nor were they part of the *res gestae*. *Id.* The Court held that the nature of the magazines was highly inflammatory and the sole function was to inflame the jury, thus their admission into evidence was unfairly prejudicial to the defendant. *Id.*

¶58. Similarly, in *Wade v. State*, Wade was convicted of sexual battery. *Wade v. State*, 583 So. 2d 965, 966 (Miss. 1991). Prior to the alleged battery, which occurred in Wade's vehicle, he showed the victim a pornographic "book."[8] *Id.* When police officers searched the vehicle, they found a bag of pornographic photographs under the seat, which was admitted into evidence. *Id.* The victim testified that Wade did not show her photographs in a bag, he showed her photographs in a book. *Id.* This Court held that the bag of photographs was not relevant to the sexual battery nor to the *res gestae* of the crime because the children did not see the bag. *Id.* at 967. It found that the nature of the photos was inflammatory and that Wade was prejudiced by the admission of the bag of photographs. *Id.*

¶59. The majority finds that the gel and gloves are relevant as objects useful in the commission of sexual battery, relying on *Wilkins*. First, whether gel and gloves are useful in the commission of sexual battery invites rampant speculation, undermining the relevance of the objects. Second, *Wilkins* states that such objects "*found at the scene*" must not be remote in time and place. *Wilkins*, 264 So. 2d at 413 (emphasis added). The gel and gloves were not located during Sergeant Starks's investigation of the property at which the alleged

---

[8]Wade testified that the children found a "book," and the children testified that Wade showed them a "book." *Id.*

23

crime occurred, and were not found at the scene. They were brought to him in a closed bag by a relative of the victim the next day. Furthermore, no witness testified as to the location of the objects during the crime, or immediately prior to or subsequent to the crime. The discovery of the objects was remote to both the time and place of the alleged battery. Therefore, the trial court abused its discretion in finding that the gel and gloves were relevant.

¶60. Even if the gel and gloves are relevant, they are more prejudicial than probative. Rule 403 provides that relevant evidence may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice. Miss. R. Evid. 403. Given that no evidence connected the gel and gloves to the alleged battery, any probative value of the objects is negligible. The State implied that these objects were sexual in nature, which invited rampant speculation and could easily inflame the jury, especially in a child sexual abuse case. *See White v. State*, 228 So. 3d 893 (Miss. Ct. App. 2017).

¶61. The majority finds that the admission of this evidence was harmless because the evidence against Blake is "overwhelming." While I agree that the evidence is overwhelming that Blake did *something* untoward to Robert, the evidence of *penetration* is not overwhelming. Robert's testimony regarding whether Blake touched the outside of buttocks or penetrated his anus was unclear. He testified that Blake was "digging in his butt" and also that he told the forensic interviewer that Blake touched him "on" his buttocks. The forensic interviewer testified that Robert's initial disclosure was that Blake had touched Robert "on" his buttocks. Robert did not mentioned that Blake touched him inside his buttocks. Only

24

after the interviewer asked clarifying questions did Robert state that Blake touched him inside his buttocks. The forensic interviewer's testimony regarding what Robert told her thus indicated that he used both "on" and "in," and that he had used "in" only after she asked follow-up questions. None of the witnesses testified that they saw actual penetration.

¶62. It is not clear beyond a reasonable doubt that, without the inflammatory evidence of the gel and the gloves, the jury would have found that penetration occurred. The gel and gloves appear to have been introduced to inflame the jury, and their admission into evidence invited rampant speculation, because they had no connection to the alleged battery. Therefore, the trial court abused its discretion by admitting these objects into evidence, and that error prejudiced Blake. I would reverse his conviction and remand the case to the trial court for further proceedings.

**KITCHENS, P.J., JOINS THIS OPINION.**