# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00256-COA

MARCUS McCAMMON A/K/A MARCUS WADE        APPELLANT
McCAMMON A/K/A MARCUS W. McCAMMON

v.

STATE OF MISSISSIPPI        APPELLEE

DATE OF JUDGMENT:        10/31/2017
TRIAL JUDGE:        HON. WILLIAM E. CHAPMAN III
COURT FROM WHICH APPEALED:        MADISON COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:        KELLY GUNTER WILLIAMS
        KENNETH BRUCE DAVIS
        DAVID L. VALENTINE
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
        BY: MATTHEW WYATT WALTON
DISTRICT ATTORNEY:        MICHAEL GUEST
NATURE OF THE CASE:        CRIMINAL - FELONY
DISPOSITION:        AFFIRMED - 02/04/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE J. WILSON, P.J., McDONALD AND McCARTY, JJ.**

**J. WILSON, P.J., FOR THE COURT:**

¶1. Following a jury trial in the Madison County Circuit Court, Marcus McCammon was convicted of the sexual battery of a seven-year-old girl (LAV). The circuit court sentenced him to serve thirty years in the custody of the Department of Corrections, with ten years suspended and five years of post-release supervision. On appeal, McCammon raises a total of eight issues. He argues that the trial judge erred by excluding his expert witnesses and LAV's mental health records. He argues that the trial judge erred by admitting his two

statements to law enforcement officers, evidence of his "prior bad acts," and LAV's hearsay statements to a neighbor. He also argues that a juror should have been excused for cause and that he was entitled to additional jury instructions. Finally, he challenges the sufficiency and weight of the evidence. We find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. In November 2016, Shaynetel Robinson was at her mother's house in the evening after work. Robinson's mother and younger sister, neighbor Ivy Fulton, and Fulton's granddaughter (LAV) were all in the living room. LAV lived with Fulton at this time. The kids were playing on the floor while Fulton and Robinson's mother chatted nearby. Robinson sat down to play with the kids, and she overheard Fulton say that LAV had been "acting out" recently. Robinson had only known LAV for three or four months. She knew LAV because LAV and Robinson's sister were friends and schoolmates.

¶3. Robinson asked LAV what was going on and whether there was anything she wanted to talk about that she was not comfortable discussing with her grandmother. LAV said yes, so Robinson took LAV to a bedroom to continue their conversation. LAV then told Robinson that at some point she had asked Marcus McCammon—Fulton's live-in boyfriend—if he wanted a massage, and McCammon told her that he wanted her to massage his penis. LAV told Robinson that she had not told anyone else about the incident because she was scared of what might happen and that she might get in trouble. LAV told Robinson that McCammon said he would leave Fulton if she told anyone what had happened.

¶4. LAV asked Robinson to tell Fulton. Fulton was alone when Robinson and LAV

2

returned to the living room. Robinson started to tell Fulton that LAV had asked McCammon if he wanted a massage, and Fulton interrupted her and stated that it was normal for LAV to offer shoulder massages. Robinson then told Fulton the whole story.

¶5. On November 17, 2016, Fulton and LAV confronted McCammon about the abuse at their home. During the confrontation, LAV called 911 and told the dispatcher that McCammon had abused her.

¶6. Officer Ryan Wigley of the Madison Police Department received a call from another officer who had responded to LAV's 911 call. The responding officer told Wigley that McCammon was still present at the home. Wigley asked whether McCammon wanted to tell his side of the story, and McCammon said that he did. So Wigley met McCammon at the Madison Police Department for an interview.

¶7. A video of the interview was admitted into evidence at trial and published to the jury. McCammon told Wigley that the garage of his house had a seating area with chairs and a TV where McCammon went to smoke. McCammon said that one night he woke up in the chair to find LAV massaging his penis. McCammon told Wigley that his penis was in his pants. McCammon never told anyone about the incident. McCammon also said that LAV liked to give men massages and to bounce on their laps. McCammon said he thought that LAV got sexual excitement from it. McCammon indicated that LAV might have been a victim of sexual abuse previously, and he suggested that Wigley ask Fulton about it. However, Fulton later told Wigley that she "didn't know anything" about a previous incident.

¶8. After interviewing McCammon, Wigley asked the Children's Advocacy Center to

3

conduct a forensic interview with LAV. Wigley testified that forensic interviewers have been trained to interview children who have alleged physical or sexual abuse. Wigley observed the interview but did not participate.

¶9. After the forensic interview, McCammon was charged with sexual battery. He was arrested and brought to the police department for a second interview, which was also recorded. He was informed of his *Miranda* rights, and he signed a waiver of those rights. In the second interview, McCammon changed his story. He now claimed that he was asleep in a chair in the garage and woke to find LAV rubbing his penis on her mouth. He also said that LAV had a bottle of lotion with her. McCammon said that Fulton was not home at the time, and LAV's younger brother was inside the house watching television. McCammon told no one about the incident. Wigley showed McCammon a photograph of the garage and asked to identify the chair where the encounter occurred. McCammon identified the same chair that LAV identified as the location of the assault.

¶10. LAV testified at trial that she was born in January 2008 and that McCammon sexually abused her multiple times when she was seven years old. LAV stated that she and her younger brother were living with Fulton and McCammon at the time. She stated that McCammon moved out after "he did sexual abuse to [her]." The prosecutor asked LAV to explain what she meant. LAV testified McCammon made her perform oral sex on him while they were in the garage and Fulton was out shopping. LAV stated she was seven years old at the time and that she did not tell anyone. That was the first time it happened.

¶11. LAV testified that McCammon sexually abused her again. The second instance of

4

abuse was similar to the first—McCammon again made her perform oral sex on him in the garage while her grandmother was out—except that McCammon ejaculated ("something white came out"). This occurred during summer break when LAV was seven years old. McCammon told LAV that his semen was "baby medicine" and that she needed to "drink it." LAV explained how the semen looked ("white and thick") and tasted ("salty"). She did not know what it was. Again, LAV did not tell anyone.

¶12. LAV testified that McCammon made her perform oral sex on him again, on a subsequent occasion, until he ejaculated. LAV testified that McCammon was again sitting in "his chair" in the garage and that he "always" sat there. On this occasion, McCammon also performed oral sex on LAV.

¶13. LAV also testified to a similar instance of abuse that took place inside the home on a couch. LAV was unsure whether the incident on the couch was the third or fourth time that McCammon abused her. LAV admitted that she had forgotten to mention the couch on direct examination. She explained, "I'm a kid. I forget stuff." She also stated that she had "practiced and practiced" with the prosecutor, who "took notes" during their first conversation and "trie[d] to correct" LAV when she misspoke. LAV stated she had not "practiced" her testimony with Fulton or anyone other than the prosecutor.

¶14. LAV decided to tell Robinson about the abuse because she "couldn't take it anymore." She also testified that the "only reason" she did not tell anyone sooner was because McCammon had "threatened he would kill [her], and he owned ten guns in the house." LAV testified that she was scared of McCammon.

5

¶15. On cross-examination, LAV testified that she knew the difference between the truth and a lie and that she had gotten in trouble before for not telling the truth. LAV testified that she called 911 to report McCammon "[b]ecause [she] couldn't take it. He did something wrong, and he needed to pay the price." LAV also testified that she had been afraid that no one would believe her because she was just "a kid." LAV denied that she had been in any sort of serious trouble the day that she disclosed the abuse to Robinson. She admitted that she had stolen a check from Fulton and that Fulton had said she "could go to jail for that." But LAV stated that Fulton got her check back and that it was no longer an issue. She denied that the check had anything to do with her decision to disclose the abuse.[1]

¶16. McCammon testified in his defense. He met Fulton in October 2011 and moved in with her in March 2012. Sometime in 2013, LAV came to live with them. McCammon testified that he had no issues with LAV at the beginning. At some point, LAV started having weekend visits with her mother. McCammon claimed that LAV would return from those visits "with a different attitude" and that she became "hateful" toward him.

¶17. McCammon claimed that he was intoxicated during his first interview with Wigley. He claimed that he "hardly remember[ed]" that interview. He admitting telling Wigley that LAV had been rubbing his penis through his pants. He also admitted that he told officers in his second interview that he woke to find LAV rubbing his penis on her lips. He said that his second version of events was the truth. He claimed that he did not offer a complete

---

[1] LAV had stolen the check because she wanted to buy a painting from another student for five dollars, but she did not have five dollars. She thought she could pay for it with one of Fulton's checks.

account during his first interview because he was intoxicated. McCammon denied that he ever sexually abused LAV.

¶18. McCammon testified that he had only one encounter with LAV that was sexual in nature. He testified that he fell asleep in his chair in the garage. He claimed that LAV unzipped his blue jeans, removed his penis from his briefs, and then put her lips on it—all while he was asleep. McCammon testified that LAV would have been about seven years old at the time this incident occurred. McCammon stated that he had been asleep for about two hours when it occurred, that LAV's brother was inside the house watching television, and that Fulton was out shopping.

¶19. McCammon testified that he immediately made LAV stop and told her never to do it again. He said that he did not tell Fulton because "there was too much going on," and he "didn't want to make nothing no more worse." McCammon testified that Fulton never disciplined LAV and that he did not think she would discipline her even for behavior like this. McCammon related a prior incident when, according to him, Fulton had not disciplined LAV after she had "mooned" him.

¶20. McCammon testified that the same day LAV disclosed the alleged abuse to Robinson, she had gotten in trouble for stealing a check from Fulton and giving it to a friend on the school bus. Fulton went to the school and confronted LAV about it.

¶21. McCammon denied LAV's allegation that he asked her to massage his penis. McCammon testified that LAV liked giving massages and that she usually gave them on shoulders or legs. He had gotten a shoulder massage from her before. McCammon

7

suggested that someone must have abused LAV in light of her knowledge of semen. However, he denied that he was the abuser.

¶22. The jury found McCammon guilty of sexual battery, and the court sentenced him to serve thirty years in custody of the Department of Corrections, with ten years suspended and five years of post-release supervision. McCammon filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

## ANALYSIS

¶23. As discussed in the introduction to this opinion, McCammon raises eight issues on appeal. We address each of his claims in turn below.

### I. McCammon's Proposed Experts

¶24. McCammon offered two experts, Dr. Charles H. Heller and Dr. Stanley G. Smith, to support his theory of defense, which essentially was that LAV had fabricated her allegations because she was a troubled child. The trial judge concluded that neither expert's testimony would be helpful to the jury; therefore, the judge excluded their testimony.

¶25. Pursuant to Mississippi Rule of Evidence 702, the trial judge must act "as gatekeeper on questions of admissibility of expert testimony." *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 40 (¶25) (Miss. 2003). "The proponent of expert testimony must show by a preponderance of the evidence that the expert is qualified, that he possesses scientific knowledge that will assist the jury, and that his testimony is based on sufficient facts and data and reliable principles and methods, reliably applied to the facts of the case." *Brown v. Prof'l Bldg. Servs. Inc.*, 284 So. 3d 754, 761-62 (¶30) (Miss. Ct. App. 2017), *aff'd*, 252 So.

8

3d 23 (Miss. 2018). The trial judge "must consider whether the expert opinion is based on scientific knowledge (reliability) *and* whether the expert opinion will assist the trier of fact to understand or determine a fact in issue (relevance)." *Edmonds v. State*, 955 So. 2d 787, 791 (¶5) (Miss. 2007) (emphasis added). "To be relevant, the evidence must 'fit' the case by being 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Corrothers v. State*, 148 So. 3d 278, 294 (¶24) (Miss. 2014) (quoting *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 591 (1993)).

¶26. "[T]he admission of expert testimony is within the sound discretion of the trial judge." *McLemore*, 863 So. 2d at 34 (¶4). Thus, we must affirm the trial judge's ruling unless it was an abuse of discretion. *Id.*

### A. Dr. Charles Heller

¶27. McCammon tendered Dr. Heller as an expert in "common areas in child abuse evaluations and in the assessment of alleged child sex abuse"; "problems of false allegations and child witnesses"; and "early childhood neglect and abandonment by parents on children's psyche and behavior." McCammon intended to introduce LAV's medical and mental health records into evidence through Heller's testimony.

¶28. Heller would have testified about the common errors in child sex-abuse evaluations and assessments. Specific to this case, he would have testified that there was a lack of evidence to corroborate LAV's allegation; that the forensic interviewer did not ask LAV the "right" questions, did not look for corroborating details, and did not look at LAV's "total history"; and that there was "poor correlation between examiners" LAV met with.

9

¶29. Generally, Heller opined about false allegation rates and the reasons that a child might make a false allegation of abuse. Heller testified during a *Daubert* hearing that children are suggestible and sometimes make false allegations against others in the hopes of diverting attention from (and avoiding punishment for) their own behavior. Heller said that he saw some "red flags" in LAV's story, namely, variations in her accounts of details of the abuse. Heller stated that a child will sometimes add details to her story in an effort to make it more believable to adults. Heller did not opine that LAV was lying. He could not say whether the changes indicated lies or just a development of memory.

¶30. Heller also wanted to testify about the "risk factors" associated with children who make false sex abuse allegations. Specific to this case, he wanted to testify that LAV's neglect and abandonment by her biological parents may have had a negative effect on her psyche and behavior. To support this theory, Heller pointed to the fact that LAV's mother was a drug addict who abandoned LAV and later gave custody to Fulton, that LAV's father was out of the picture, that LAV had no good male paternal image, and that LAV had been exposed to domestic violence in the past. Again, Heller could not say that LAV was lying about the alleged abuse in this case or that she was a pathological liar. He simply wanted to suggest that these issues were "risk factors."

¶31. Heller stated that he could not testify that LAV was lying because he had not examined her personally. He did believe that she was at a greater risk of making false allegations due to her past. But he could only answer general questions about children who lie. In order to prepare for his testimony, Heller had reviewed LAV's mental health and

10

medical records from the previous five years, which included records from the University of Mississippi Medical Center (UMMC), Region 8 Mental Health Services, and Catholic Charities Counseling Services. He also reviewed LAV's statements and forensic interview, her school records, and other discovery.

¶32. Heller's ultimate opinion was that if at least one "red flag" or indicator was present in a child's history, the child would be at a higher risk of making a false allegation of sex abuse than in a case where no red flags were present.

¶33. The trial judge ruled that Heller was "a qualified expert probably in something" but that Heller would not be allowed to testify. The judge reasoned that if an expert cannot testify that because a defendant has certain qualities, the defendant is guilty, then an expert could not say that because a *victim* had certain qualities, the victim must be lying. The judge explained that he had reached this decision because Heller's testimony was all too "general" and that Heller's general opinions about children and their propensity to lie would not assist the jury. Thus, the trial judge excluded Heller's opinion as not relevant to the issue of whether McCammon committed sexual battery. The judge went on to state that even if the opinion was relevant, then the probative value of that opinion would be substantially outweighed by its prejudicial effect, resulting in confusion to the jury.

¶34. We find no abuse of discretion in the trial judge's exclusion of Heller's proposed testimony. Heller identified possible "red flags" with LAV that, in his opinion, might indicate she was at "risk" for making a false report. However, he could not opine that her statements or demeanor during her forensic interview were inconsistent with a child who had

11

in fact been abused. Moreover, any inconsistencies in the details of LAV's statements or her alleged motivation to divert attention from her own bad behavior are ordinary credibility issues that can and should be presented to a jury without expert testimony. As the standard jury instruction puts it, jurors can use their own common sense and sound, honest judgment to assess a witness's credibility. There is no need for an expert to catalogue alleged inconsistencies in the witness's statements or her alleged motives to lie.

## B. Dr. Stanley Smith

¶35. McCammon offered Dr. Smith as an expert in neuroscience and child sexual abuse and how the brain functions and develops in relation to sexual abuse—both for perpetrators and for victims. As with Heller, the trial judge recognized that Smith was "a qualified expert probably in something."

¶36. During a *Daubert* hearing, Smith testified that he had conducted a forensic interview and a range of tests on McCammon. One test supposedly indicated that McCammon had "high traditional moral values." Another test supposedly showed that McCammon was not a psychopath or pedophile as defined by the Diagnostic and Statistical Manual of Mental Disorders (DSM). Smith contended that McCammon did not have any of the DSM-listed characteristics of a pedophile. Smith also testified that most pedophiles have brain damage to the prefrontal cortex, but a scan of McCammon's brain revealed no such damage. Smith also did a test called the Abel Assessment for Sexual Interest. Smith said the results of this test indicated that McCammon had none of the "classic" pedophilic or child sexual abuse indicators. In fact, Smith testified that the test indicated that there was an "extremely low

12

probability" that McCammon was a pedophile. Smith's ultimate opinion was that McCammon does not have the characteristics of a pedophile. However, we note that, aside from the brain scan, Smith's various tests consisted primarily of asking McCammon questions. McCammon assured Smith that he had good moral values and no sexual interest in children.

¶37. The trial judge excluded Smith's proposed testimony after concluding that his methods were not widely accepted or reliable. The trial judge also concluded that McCammon's general characteristics were not relevant to whether he did or did not commit the specific abuse alleged in this case. He also concluded that the risk of confusing the jury substantially outweighed the probative value, if any, of Smith's testimony.

¶38. This Court considered a similar issue in *Earnest v. State*, 805 So. 2d 599 (Miss. Ct. App. 2002), where the defense offered expert opinion testimony from two doctors after they had evaluated the defendant and conducted a battery of tests on him. *Id.* at 606 (¶22). The experts in *Earnest* wanted to offer the opinion that Earnest did not fit the profile of a sexual offender. *Id.* at (¶24). The trial judge determined that those opinions would not assist the jury in determining whether Earnest committed the sexual offense, specifically because there was "no scientifically acceptable profile of a sex offender." *Id.* We affirmed the trial judge's exclusion of this expert testimony. *Id.*

¶39. We reach the same result here. The trial judge excluded Smith's testimony after concluding that Smith's opinion relied on McCammon's general characteristics and that those characteristics were not relevant to whether he actually committed the crime for which

13

he was charged. Based on the testimony presented to the trial judge, we cannot say that this was an abuse of discretion.

## II. LAV's Mental Health and Medical Records

¶40. On appeal, McCammon argues that the trial judge abused his discretion by excluding LAV's records from UMMC, Region 8, and Catholic Charities. He argues that the exclusion of the records denied him the right to present his defense to the jury because this evidence was relevant to LAV's credibility, motives to lie, and "red flags" related to her parents' drug use, et cetera.

¶41. We review the exclusion or admission of evidence for an abuse of discretion. *Collins v. State*, 172 So. 3d 724, 738-39 (¶14) (Miss. 2015). "A criminal defendant is entitled to present his defense to the finder of fact, and it is fundamentally unfair to deny the jury the opportunity to consider the defendant's defense where there is testimony to support the theory." *Edmonds v. State*, 955 So. 2d 787, 798 (¶29) (Miss. 2007); *see also Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007) ("[T]he Due Process Clause prohibits a State from punishing an individual without first providing that individual with an opportunity to present every available defense." (quotation marks omitted)). "While a defendant is entitled to present his defense, the right is not without its limitations, as all evidence admitted in support of the defendant's theory of the case must comport with the Mississippi Rules of Evidence." *Scott v. State*, 231 So. 3d 1024, 1031 (¶12) (Miss. Ct. App. 2016) (quotation marks omitted), *aff'd by an evenly divided Court*, 231 So. 3d 995 (Miss. 2017).

¶42. After the State rested its case-in-chief, McCammon informed the court that he

14

intended to call Zakia Simpson, a counselor from Catholic Charities, to testify about inconsistencies in LAV's statements during counseling and other information in her counseling records. McCammon argued that Simpson's testimony and LAV's counseling records were relevant to LAV's credibility. The judge asked whether McCammon was attempting to impeach LAV's testimony with prior inconsistent statements, and counsel indicated that he was. The judge stated that such impeachment would be improper because LAV had not been given an opportunity to explain or deny such statements. *See* M.R.E. 613(b). McCammon then asserted that Simpson's testimony and LAV's counseling records were relevant and admissible for additional reasons. However, the State objected to the testimony and records. The judge then allowed McCammon to proffer Simpson's testimony and any allegedly relevant records. Following a lengthy proffer, the judge excluded the testimony and proffered documents, providing a specific ruling as to each exhibit.

¶43.     On appeal, McCammon generally asserts that the trial judge abused his discretion by excluding proffered exhibits "D3 through D11" because the records allegedly "document a lengthy history of exposure to drug use, neglect and abandonment by her natural parents, as well as the resulting behavioral problems and mental health issues, including manipulative behaviors that support [his] theory of defense that [LAV] fabricated the allegation against him." Proffered exhibits D3 through D9 are records of Catholic Charities. Proffered exhibits D10 and D11 are records of UMMC and Region 8 that were not mentioned during Simpson's testimony. We will address the Catholic Charities records first.

¶44.     A few of the Catholic Charities records briefly allude to the facts that LAV's parents

15

neglected her and her brother and abused drugs before LAV went to live with Fulton. The documents provide few details. Assuming that LAV's statements to the counselor were admissible as statements made for the purpose of medical diagnosis or treatment, *see* M.R.E. 803(4), the trial judge did not abuse his discretion by excluding the records as irrelevant. M.R.E. 402 ("Irrelevant evidence is not admissible."). LAV's parents' drug abuse and neglect did not involve anything of a sexual nature and occurred about two years prior to the sexual abuse at issue in this case.

¶45. Two other documents described counseling sessions with LAV and Fulton in which the counselor perceived and noted that LAV was being manipulative. Simpson testified that "most kids" exhibit similar behavior, and she could not recall the details of the issues discussed during the sessions. These notes do not suggest that LAV fabricated her allegations against McCammon in order to manipulate anyone. We cannot say that the trial judge abused his discretion by ruling that the notes were irrelevant. M.R.E. 402.

¶46. In addition, the statements are hearsay and are not within Rule 803(4)'s exception for statements made for the purpose of medical diagnosis or treatment. The relevant statements were *not* made by LAV or Fulton to the counselor for the purpose of diagnosis or treatment. Rather, they were the counselor's own opinions or impressions of LAV's behavior during this session, which are inadmissible hearsay. *In re E.G.*, 191 So. 3d 763, 772-73 (¶¶29-31) (Miss. Ct. App. 2016) (holding that a patient's statements to a psychologist for the purpose of evaluation and treatment might be admissible under Rule 803(4), but the psychologist's own impressions and opinions of the patient were not).

¶47. Finally, to the extent that McCammon intended to use LAV's counseling records to impeach her testimony with prior inconsistent statements, the trial judge correctly ruled that the records were not admissible for that purpose because McCammon made no attempt to confront LAV with any of the statements while she was on the stand. M.R.E. 613(b); *Blake v. State*, 256 So. 3d 1161, 1166 (¶22) (Miss. 2018). Nor did McCammon attempt to recall LAV for that purpose. *See Portis v. State*, 245 So. 3d 457, 471 (¶34) (Miss. 2018) (holding that the trial court did not abuse its discretion by not allowing the defendant to recall a witness to confront her with a prior statement because the defendant "had not attempted to enter the statement into evidence during [the witness's prior] cross-examination, nor had [he] subpoenaed [the witness] to testify in his case in chief").

¶48. We now address proffered defense exhibits D10, which consists of 109 pages of LAV's records from Region 8, and D11, which consists of 306 pages of LAV's records from UMMC. Prior to trial, the State filed a motion in limine to exclude any evidence of LAV's parents' drug abuse and neglect of LAV and any evidence of LAV's prior mental health issues. LAV's records from Region 8 and UMMC apparently were submitted to the trial judge for review in connection with the State's motion. McCammon opposed the State's motion and argued that the records were relevant to LAV's credibility and propensity to lie. However, during a pretrial motion hearing, the trial judge stated that he would grant the State's motion in limine because he found that LAV's parents' drug abuse and neglect of LAV and LAV's prior mental health issues were not relevant. The judge also noted that there was nothing in the records to suggest that LAV had any sort of prior sexual knowledge

17

(which could have supported McCammon's versions of events). However, the judge specifically stated that he was *not* prohibiting McCammon from calling witnesses (such as Fulton) who could testify as to LAV's character for untruthfulness. *See* M.R.E. 608. Finally, the judge ultimately stated that he could not foreclose all possible uses of the records:

> I will take that up at trial, but I will say in a general sense I don't believe the wholesale admission of a victim's, quote, medical records is necessarily appropriate, and y'all will have to make an argument as to the reasons those things should be admitted when I get to that point in trial.

McCammon did not offer specific records from D10 or D11 during the trial. Rather, McCammon proffered D10 and D11 in their entirety after the jury had already retired to deliberate, and the trial judge allowed the records to be marked for identification.

¶49. We find no abuse of discretion in the trial judge's pretrial ruling that the "wholesale admission" of LAV's mental health records was not appropriate. The judge did not abuse his discretion by finding that LAV's parents' drug abuse and neglect of LAV and LAV's general mental health history were not relevant to the sexual abuse at issue in the trial.

¶50. As we stated above, "a defendant is entitled to present his defense," but that "right is not without its limitations, as all evidence admitted in support of the defendant's theory of the case must comport with the Mississippi Rules of Evidence." *Scott*, 231 So. 3d at 1031 (¶12) (quotation marks omitted). The trial judge in this case did not abuse his discretion by excluding LAV's counseling and medical records pursuant to the Rules of Evidence.

### III.    McCammon's Statements to Law Enforcement

¶51. McCammon made two statements to law enforcement, one prior to his arrest and one after his arrest. The trial judge denied McCammon's pretrial motion to suppress the

18

statements. McCammon argues that the trial judge erred because both statements were obtained in violation of his Fifth Amendment right to remain silent.

¶52. We will not reverse the trial court's ruling on a motion to suppress unless the ruling was manifestly wrong, based on an incorrect legal standard, or against the overwhelming weight of the evidence. *Keller v. State*, 138 So. 3d 817, 835 (¶16) (Miss. 2014). The trial judge "sits as the fact-finder when determining the issue of whether an accused's [statement] has been intelligently, knowingly and voluntarily given." *Id.* (quoting *Glasper v. State*, 914 So. 2d 708, 716 (¶21) (Miss. 2005)).

¶53. *Miranda* warnings advising a suspect of his right to remain silent and right to an attorney "must be given *before a suspect is subjected to custodial interrogation*." *Batiste v. State*, 121 So. 3d 808, 857 (¶121) (Miss. 2013) (emphasis added). "'Custodial interrogation' means the suspect is both in custody and undergoing interrogation." *Id.* at 857-58 (¶121). A suspect is "in custody" if, under all the circumstances, a "reasonable person" would believe that his "ability to freely leave" has been "restricted." *Culp v. State*, 933 So. 2d 264, 273 (¶19) (Miss. 2005). "[T]he initial determination of custody depends on the *objective* circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). We consider the totality of the relevant circumstances, including the time and place of the interview, who is present, whether officers use force or physical restraints, the length of the interview and nature of the questions, whether the suspect came to the authorities voluntarily, and what the suspect was told about the situation. *Hunt v. State*, 687

19

So. 2d 1154, 1160 (Miss. 1996). If the objective circumstances of the encounter indicate that a suspect is not "in custody," no *Miranda* warnings are required.

¶54.    In addition, a suspect who is "in custody" may waive his *Miranda* "rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "The voluntariness of a waiver, or of a confession, is a factual inquiry that must be determined by the trial judge from the totality of the circumstances." *Pinter v. State*, 221 So. 3d 378, 387 (¶21) (Miss. 2017) (quoting *Houston v. State*, 170 So. 3d 542, 545 (¶12) (Miss. Ct. App. 2014)).

### A.    The First Interview

¶55.    On November 17, 2016, the night that law enforcement first received a report about the abuse, a Madison police officer went to Fulton's home. McCammon told the officer that he would like to go to the police station to give his side of the story. McCammon told the officer that "he didn't feel comfortable driving because he had had a beer," so McCammon rode with the officer to the police station.

¶56.    When Investigator Wigley arrived at the police station, McCammon was waiting in the break room. Wigley asked McCammon if he would like to tell his side of the story, and McCammon agreed. They went into an interview room, and their conversation was recorded. McCammon was not handcuffed or restrained. In fact, Wigley clearly advised McCammon that he was free to leave, and Wigley confirmed that McCammon had come to the station voluntarily. McCammon told Wigley that he "felt like" he was under arrest. But Wigley again told McCammon that he was *not* under arrest and could leave at any time.

20

¶57. Wigley asked McCammon why LAV would accuse him of sexual abuse. McCammon stated that he thought someone else might have abused LAV in the past. McCammon stated that LAV liked to massage men on their shoulders, legs, and back. He told Wigley that one night he had been sleeping in a chair in the garage when he woke up to LAV massaging his penis through his pants. He asked what she was doing, and she did not respond but left the garage. McCammon said he did not tell Fulton about what had happened. He alleged that LAV got "sexual excitement" from massaging men and sitting on their laps. He stated that LAV had never touched his penis before or since the one incident in the garage, and he denied ever touching LAV inappropriately.

¶58. After McCammon gave his statement, Wigley explained that McCammon would have to find somewhere else to stay while the Department of Child Protective Services conducted its investigation. McCammon asked what was the next step, and Wigley explained that LAV would have a forensic interview before anything else happened. McCammon told Wigley that he had been given a ride to the police station, and Wigley said that an officer would take him back to his home so that he could get his vehicle.

¶59. It is clear from the video of this interview that it was not a "custodial interrogation." McCammon asked to give his side of the story, and he went to the police station voluntarily. He was told more than once that he was not in custody and that he was free to leave, and he did in fact leave the station that night without being placed under arrest. McCammon was not placed under any physical restraints, and Wigley asked him open-ended questions that allowed him to tell his side of the story. In short, the trial judge did not err by finding that

21

McCammon was not "in custody" based on the objective totality of the circumstances. Therefore, McCammon was not entitled to *Miranda* warnings prior to or during his initial interview, and the trial judge did not err by admitting the recorded interview into evidence.[2]

### B.     The Second Interview

¶60.    McCammon was arrested on November 30, 2016, and taken again to the police station. He was taken to an interview room, and Officer Cooley read him his *Miranda* rights. The recording of the interview shows Cooley explaining each right to McCammon, one at a time. McCammon was given a written *Miranda* waiver, and he initialed next to each right after Cooley explained it to him. McCammon asked Cooley questions, and Cooley fully explained that by signing the waiver form, McCammon was agreeing to speak with officers and waive his rights to remain silent and to have an attorney present. Finally, McCammon signed the waiver form. Officers then questioned him. During this interview, McCammon told officers that he was asleep in a chair in the garage and awoke to LAV putting her lips on his penis.

¶61.    The trial judge found that McCammon knowingly, intelligently, and voluntarily waived his rights. Therefore, the judge denied McCammon's motion to suppress the second

---

[2] McCammon makes a brief argument that his initial statement was involuntary because he was intoxicated. "Intoxication does not automatically render a confession involuntary," but the trial court may consider "the degree of intoxication" as part of its voluntariness inquiry. *Taylor v. State*, 94 So. 3d 298, 309 (¶30) (Miss. Ct. App. 2011) (quoting *Morris v. State*, 913 So. 2d 432, 434 (¶7) (Miss. Ct. App. 2005)). McCammon asked for a ride to the police station because he "had had a beer." However, Wigley and another officer testified that they did not observe any signs that McCammon was intoxicated, and the video of the interview corroborates their testimony. The trial judge did not clearly err by finding that McCammon's statement was voluntary.

statement, and the recorded statement was admitted into evidence. On appeal, McCammon argues that his second statement was "tainted" and inadmissible because officers failed to read him his *Miranda* rights prior to his first statement. This argument fails because we have already held that no *Miranda* warnings were required prior to the first statement.

¶62. McCammon also argues that his *Miranda* waiver was ineffective because officers "made no effort to ensure that [he] understood the rights listed on the waiver." However, as discussed above, the video of the interview contradicts this claim. Cooley went through the waiver carefully and answered McCammon's questions clearly. The trial judge did not clearly err by finding that McCammon executed a valid waiver.

¶63. McCammon also argues that the *Miranda* warnings before his second statement were ineffective because he was intoxicated at the time. However, the officers testified that they saw no signs of intoxication, and McCammon did not tell the officers during the interview that he had been drinking. The trial judge also reviewed the video of the interview and saw no indication of intoxication. Again, the trial judge did not clearly err by finding that McCammon was not intoxicated and that his waiver and statement were voluntary.

### C. Authentication

¶64. McCammon also briefly argues that the State failed to properly authenticate the videos of his statements before they were admitted into evidence. However, McCammon fails to explain how the State failed to authenticate the videos.

¶65. Under Mississippi Rule of Evidence 901, the authentication requirement is satisfied when the proponent produces "evidence sufficient to support a finding that the item is what

23

the proponent claims it is." M.R.E. 901(a). A recording may be authenticated "by testimony from someone familiar with and with knowledge of the contents of the . . . recording." *Wilson v. State*, 267 So. 3d 264, 270 (¶27) (Miss. 2019) (citing M.R.E. 901(b)(1)). Once a proponent has made this prima facie showing of authenticity, "the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Sewell v. State*, 721 So. 3d 129, 140 (¶60) (Miss. 1998).

¶66. Officer Wigley was present for both interviews with McCammon. He testified as to how the recordings were made and burned to discs. He also testified that the videos were fair and accurate recordings of the interviews. The trial court did not abuse its discretion in finding that the videos were properly authenticated.

### IV. Other Bad Acts Evidence

¶67. McCammon next argues that the State should not have been allowed to introduce evidence of three other sexual acts McCammon allegedly performed on LAV that were not the subject of the indictment. He argues that LAV's testimony did not distinguish the indicted act from the other acts. This, he says, put him in the position of having to defend himself against all acts, not just the one in the indictment.

¶68. McCammon's indictment alleged that "on or about and between the dates of June 1, 2015, through or until September 1, 2015 . . . [McCammon] . . . did willfully, unlawfully and feloniously engage in sexual battery, . . . by having [LAV], a female child whose age was under fourteen (14) years . . . perform fellatio while the said [LAV] was 24 months or more younger than [McCammon]." Prior to trial, the State filed a notice of its intent to introduce

24

three other incidents of sexual abuse under Mississippi Rule of Evidence 404(b) to show the "lustful, lascivious nature" of McCammon toward LAV. At a hearing, the State explained that LAV would testify to four sexual acts by McCammon: once when McCammon told her to massage his penis; once when he performed cunnilingus on her; once when she touched his penis; and the indicted act, when she performed fellatio on him.

¶69. The trial judge ruled that the evidence was relevant and admissible for a permitted purpose under Rule 404(b) and that the probative value of the evidence was not substantially outweighed by any prejudice to McCammon. However, the judge also stated that he would give a limiting instruction regarding the evidence of unindicted acts. He gave the instruction (S-3) after the close of the evidence, along with all other jury instructions, at McCammon's request. The instruction generally tracked the instruction given in *Gore v. State*, 37 So. 3d 1178, 1184 (¶14) (Miss. 2010), and read as follows:

> The Court instructs the jury that acts testified to by [LAV] are acts relating to charges for which the defendant is not presently on trial and are to be considered only for the limited purpose of showing proof of motive, intent, or absence of mistake or accident. You cannot and must not simply infer that the defendant acted in conformity with his previous acts and that he is therefore guilty of the charge for which he is presently on trial.

¶70. In a criminal case, evidence of other crimes committed by the defendant "is not admissible to prove [the defendant's] character in order to show that . . . [he] acted in accordance with [his] character" by committing the crime alleged in the indictment. M.R.E. 404(b)(1). However, such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." M.R.E. 404(b)(2). If the evidence is offered for a permissible (non-

25

character) purpose, it still "must pass through the ultimate filter of [Rule] 403." *White v. State*, 842 So. 2d 565, 574 (¶27) (Miss. 2003). Under Rule 403, the evidence should be excluded if its probative value is "substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." M.R.E. 403. Applying Rules 403 and 404(b), our Supreme Court "has repeatedly held that 'evidence of prior sexual acts between the accused and the victim is admissible to show the accused's lustful, lascivious disposition toward the particular victim, especially in circumstances where the victim is under the age of consent.'" *Caldwell v. State*, 6 So. 3d 1076, 1078 (¶6) (Miss. 2009) (quoting *Walker v. State*, 878 So. 2d 913, 915 (¶14) (Miss. 2004)).

¶71. LAV testified that when she was seven years old, McCammon made her perform oral sex on him while they were in the garage and her grandmother was out shopping. LAV said that he made her perform oral sex on him a second time, except this time, McCammon ejaculated. Again, they were in the garage, and her grandmother was away. LAV said it was summertime, and she was seven years old. LAV testified about a third assault, again where McCammon made her perform oral sex on him. LAV testified that the fourth and final assault occurred when McCammon performed oral sex on her and again made her perform oral sex on him. On either the third or fourth assault, LAV and McCammon were in the house on the couch, not in the garage.

¶72. As stated above, under Mississippi Supreme Court precedent, evidence of the other acts of sexual abuse perpetrated by McCammon against LAV was admissible under Rule

26

404(b) to prove his "lustful, lascivious disposition toward [LAV]." *Caldwell*, 6 So. 3d at 1078 (¶6). However, McCammon argues that all four alleged acts were similar, that the limiting instruction failed to distinguish the indicted act from the unindicted incidents,[3] and that the prejudicial value of the evidence substantially outweighed its probative value.

¶73. McCammon is correct that "evidence of prior bad acts must be clearly distinguished from evidence of substantive guilt so as to make clear the limited purpose for which it is offered." *Id.* at 1079 (¶8). "However, when Rule 404(b) evidence is presented and the trial court fails to distinguish it from evidence of substantive guilt, harmless error will not warrant reversal." *Id.* at (¶9). Such an error "is harmless when the same result would have been reached had error not existed." *Id.* (quotation marks omitted).

¶74. McCammon was indicted for having LAV perform fellatio on him sometime between June 1 and September 1, 2015, when LAV was seven years old. Prior to trial, the State identified the indicted act as the second of the four incidents of sexual abuse. At trial, the State questioned LAV specifically about whether the second incident occurred during the school year or during summer break, and LAV responded, "It was all during summer break." LAV also testified that she was seven when the first incident occurred, but she did not testify specifically about the timing of the other incidents.

¶75. Similar to *Caldwell*, the evidence was presented at trial in this case in a manner that left the jury with relatively little basis for distinguishing the substantive evidence of guilt

---

[3] We address McCammon's challenge to the instruction and denial of his proposed instruction in Part VII, *infra*.

from the Rule 404(b) evidence. However, like the Supreme Court in *Caldwell*, we conclude that the error in this case was harmless. This is not a case in which the victim's allegations were bolstered by the testimony of additional victims who accused the defendant of having abused them too. Rather, LAV was the only accuser in the case, and the jury clearly found her testimony that McCammon abused her to be credible. As in *Caldwell*, the admission of Rule 404(b) evidence was proper, and any failure to "clearly distinguish[]" it from the substantive evidence of McCammon's guilt was harmless. *Id.* at (¶¶8-9).

### V.     Tender Years Hearsay

¶76.    McCammon next argues that the trial judge erred by allowing Robinson to testify regarding hearsay statements made by LAV. He argues that the trial judge misapplied Mississippi Rule of Evidence 803(25), the tender years exception to the hearsay rule, by finding that Robinson's testimony was reliable and that LAV had no motive to lie to Robinson.

¶77.    We review the admission of evidence under the tender years exception for an abuse of discretion. *Friday v. State*, 217 So. 3d 759, 764 (¶18) (Miss. Ct. App. 2017). Rule 803(25) provides that "[a] statement by a child of tender years describing any acts of sexual contact with or by another is admissible if: (a) the court—after a hearing outside the jury's presence—determines that the statement's time, content, and circumstances provide substantial indicia of reliability; and (b) the child either (i) testifies; or (ii) is unavailable as a witness, and other evidence corroborates the act." There is no dispute that LAV is a child of tender years. *See Veasley v. State*, 735 So. 2d 432, 436 (¶16) (Miss. 1999) ("[T]here is a

28

rebuttable presumption that a child under the age of twelve is of tender years."). McCammon challenges only the trial court's finding that the circumstances of LAV's statement to Robinson "provide substantial indicia of reliability."

¶78. The comment to Rule 803(25) provides a list of factors that a trial judge should consider when determining reliability of the child's hearsay statement. They are:

> (1) whether there is an apparent motive on declarant's part to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; (5) the timing of the declarations; (6) the relationship between the declarant and the witness; (7) the possibility of the declarant's faulty recollection is remote; (8) certainty that the statements were made; (9) the credibility of the person testifying about the statements; (10) the age or maturity of the declarant; (11) whether suggestive techniques were used in eliciting the statement; and (12) whether the declarant's age, knowledge, and experience make it unlikely that the declarant fabricated.

M.R.E. 803(25) advisory committee note. A finding of substantial indicia of reliability should be made on the record, *id.*, and the trial judge in this case made detailed on-the-record findings. On appeal, McCammon asserts that the trial judge "erred by not engaging in a meaningful analysis of the [tender years] factors." However, that simply is not true.

¶79. At the pretrial tender years hearing, Robinson testified that LAV disclosed the abuse to her clearly and directly. Robinson denied telling LAV what to say or prompting her in any way. Robinson explained that she had known LAV for only a few months when the disclosure occurred. Robinson had overheard LAV's grandmother, Fulton, discussing some behavioral issues with LAV. Robinson did not really know what was going on with LAV or even if LAV had anything in particular to share. Robinson asked LAV what was going on and if she wanted to talk about it. LAV said yes, and they went into Robinson's bedroom,

alone. LAV disclosed the abuse to Robinson.

¶80. Charlene Barnette testified in a hearing about her forensic interview with LAV.[4] LAV disclosed the sexual abuse to Barnette and had specific, sensory details, including what the semen tasted and looked like. Barnette testified that this added credence to LAV's story and that LAV did not seem like she had been "coached." Barnette said that she had no opinion about whether LAV was lying or about her character in general. She said that LAV seemed embarrassed and scared during the interview. Barnette said she was not concerned about the delay in LAV's disclosure and that she had seen delays before.

¶81. Fulton testified at the hearing that LAV was smart and articulate and generally did not get in trouble at school. Fulton stated that LAV was not in trouble when she disclosed the sexual abuse. Fulton explained that LAV had taken a check from Fulton's purse to pay a classmate for a painting she wanted to buy but that Fulton had confronted her over it, and the matter had been settled. Fulton said that like many children, LAV sometimes told "white lies."

¶82. The trial judge also viewed a video of LAV's forensic interview. He also considered Dr. Heller's pretrial testimony about some of LAV's prior mental health issues and family history. The judge then ruled that the testimony was admissible. His ruling from the bench spans roughly nine pages of the transcript and addresses each of the twelve factors listed above. McCammon takes issue with the trial judge's findings on almost every factor.

---

[4] The State initially planned to introduce all or part of LAV's forensic interview at trial. However, the State ultimately decided not to introduce the video, and Barnette did not testify at trial.

30

### A. Motive to Lie

¶83. On appeal, McCammon argues that LAV had a strong motive to lie because she had recently been in trouble for stealing a check. He also argues that her prior mental health issues and issues with her parents are "indicators" of "an increased risk of a false allegation." However, based on Fulton's testimony, the trial judge found that the issue with the stolen check "had been resolved." The judge found that LAV had no motive to lie, and that finding is supported by substantial evidence.

### B. General Character

¶84. McCammon argues that LAV's counseling and medical records evince behavior problems that go to her "character." Fulton, however, testified that LAV was generally a good child who had experienced a troubled home life. The trial judge found that there was nothing in LAV's school records to contradict Fulton's testimony. We cannot say that the trial judge clearly erred.

### C. Whether More Than One Person Heard the Statement

¶85. Only Robinson heard LAV's initial disclosure of sexual abuse. The trial judge noted this fact in his ruling. On appeal, McCammon asserts that LAV's later statements to others (Fulton, law enforcement, the forensic interviewer, and counselors) differed from her initial disclosure to Robinson. However, he does not identify any specific inconsistencies, and LAV's version of events remained generally consistent from her initial disclosure through trial—despite the fact that LAV was only nine or ten years old throughout the ordeal.

### D. Whether the Statement was Spontaneous

31

¶86.    The trial judge found that LAV's statement to Robinson was relatively "spontaneous," though Robinson did first ask LAV whether there was anything that she wanted to talk about that she did not feel comfortable telling her grandmother.  McCammon argues that Robinson "prodded LAV to talk," but the trial judge did not clearly err in finding otherwise.

### E.    Timing of the Declarations

¶87.    LAV first disclosed the abuse more than a year after it occurred.  This concerned the trial judge, but Barnette testified that such a delay was not unusual.  The judge found that this factor did not weigh for or against allowing the testimony.  We find no error or abuse of discretion in the judge's consideration of this factor.

### F.    Relationship Between Declarant and Witness

¶88.    McCammon argues that LAV's statement to Robinson is less reliable because LAV had known Robinson for only two to four months at the time.  However, the trial judge found that Robinson had come to be "a trusted acquaintance of [LAV]" and that there was nothing about their relationship that would undermine the reliability of LAV's statement.  We again find no error or abuse of discretion.

### G.    Possibility of Faulty Recollection by Declarant

¶89.    McCammon argues that LAV gave inconsistent accounts of the abuse. However, the trial judge found, with substantial support in the record, that LAV's statements were generally consistent over time.

### H.    Credibility of the Witness (Robinson)

¶90.    McCammon alleges that Robinson was not a credible witness because she "clearly"

demonstrated "animosity" toward him. He also asserts Robinson "misrepresented facts," but he fails to identify any misrepresentations. He also asserts that she "changed her account," but he does not say how. The trial judge found that Robinson was a credible witness, and McCammon points to nothing in the record to contradict that assessment.

### I. Additional Factors

¶91.    With respect to factors (8), (10), (11), and (12), McCammon either does not take issue with the trial judge's findings or simply incorporates by reference his prior arguments. On these issues, the trial judge found that there was no dispute that LAV made a statement to Robinson, that LAV was appropriately mature for a child her age, that Robinson did not use suggestive techniques, and that LAV's disclosures were consistent with a child disclosing a first-time sexual experience. The judge found these factors weighed in favor of admitting LAV's statement to Robinson. The judge's findings on these issues are also supported by substantial evidence.

¶92.    In summary, the trial judge followed Rule 803(25) by conducting an evidentiary hearing outside the presence of the jury and by making specific findings on the record. The judge's findings are supported by substantial evidence, and he did not abuse his discretion by admitting the evidence.

### VI. Prospective Juror 26

¶93.    McCammon argues that the trial judge erred by denying his for-cause challenge to "Juror 26." During voir dire, defense counsel asked the jury pool if any of them, their family members, or their close friends had been the victim of any type of sexual harassment. Juror

26 revealed during a bench conference that a family member had "made sexual advances" against her then-eleven-year-old daughter, but no charges were filed. Defense counsel asked Juror 26 whether that experience would affect her ability to be fair and impartial, and Juror 26 stated that it would not. McCammon later challenged Juror 26 for cause, but the trial judge denied the challenge because Juror 26 had stated clearly that she could be fair and impartial. Later in the jury selection process, McCammon did not use a peremptory challenge to strike Juror 26, although he still had two challenges remaining. The trial judge asked, "Just to make sure I understand, you're going to accept a juror that you wanted the Court to strike for cause?" Counsel for McCammon answered, "That's correct, Your Honor." As a result, Juror 26 was seated on the jury. During oral argument in this Court, McCammon's counsel stated that they accepted Juror 26 because they were more concerned about other potential jurors after Juror 26.

¶94. On appeal, McCammon simply asserts that the trial judge should have disbelieved Juror 26's assurance that she could be fair and impartial. There is no basis in the record or the law for this argument. A juror may be removed for cause if a circumstance "exists that would likely affect his . . . impartiality at trial." *Patton v. State*, 248 So. 3d 763, 767 (¶30) (Miss. 2018) (quoting *Evans v. State*, 725 So. 2d 613, 653 (Miss. 1997)). But "[w]hether a potential juror can be fair and impartial is a judicial question reserved for the trial judge and will not be disturbed unless clearly wrong." *Id.* Moreover, "when a prospective juror assures the court that, despite the circumstance that raises some question as to his qualification, this will not affect his verdict, this promise is entitled to considerable deference." *Scott v. Ball*,

34

595 So. 2d 848, 850 (Miss. 1992). In this case, the trial judge did not abuse his discretion by accepting Juror 26's promise to be fair and impartial. *Id.* ("[W]e will not on appeal second guess [the trial judge's denial of a challenge for cause] in the absence of a record showing a clear abuse of discretion."). This issue is without merit.

## VII. Jury Instructions

¶95. McCammon argues that the trial judge erred by denying three of his proposed jury instructions. We review the denial of a jury instruction for an abuse of discretion. *Thompson v. State*, 230 So. 3d 1044, 1052 (¶24) (Miss. Ct. App. 2017), *cert. denied*, 229 So. 3d 121 (Miss. 2017). "Jury instructions must be read as a whole . . . ." *Davis v. State*, 18 So. 3d 842, 847 (¶14) (Miss. 2009). The "instructions must fairly announce the law of the case and not create an injustice against the defendant." *Id.* "This rule is summed up as follows: . . . if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Id.* (quotation marks omitted).

### A. Reasonable Doubt (D-3)

¶96. McCammon's proposed instruction D-3 read:

> The Court instructs the jury that you are bound, in deliberating upon this case, to give the defendant the benefit of any reasonable doubt of the defendant's guilt that arises out of the evidence or want of evidence in this case. There is always a reasonable doubt of the defendant's guilt when the evidence simply makes it probable that the defendant is guilty. Mere probability of guilt will never warrant you to convict the defendant. It is only when, after examining the evidence on the whole, you are able to say on your oaths, beyond a reasonable doubt, that the defendant is guilty, that the law will permit you to find [him] guilty. You might be able to say that you believe [him] to be guilty, and yet, if you are not able to say on your oaths, beyond reasonable doubt, that [he] is guilty, it is your sworn duty to find the defendant "Not Guilty."

35

The State objected to D-3 as an attempt to define reasonable doubt, and the judge refused the instruction on those grounds.

¶97.   "[The Mississippi Supreme] Court has long held that a definition of reasonable doubt is not a proper instruction for the jury; reasonable doubt defines itself." *Fulgham v. State*, 46 So. 3d 315, 332 (¶46) (Miss. 2010) (quotation marks omitted).  In *Fulgham*, the Court held that the trial judge did not abuse his discretion by denying this same instruction because it improperly attempted to define reasonable doubt. *Id.* at (¶¶44, 46).  This Court followed *Fulgham* and affirmed the denial of the same instruction in *Thompson*, 230 So. 3d at 1052 (¶¶25-26).   The jury instructions in the present case clearly instructed the jurors that McCammon was presumed innocent, that the State bore the burden of proving each element of the crime beyond a reasonable doubt, that their verdict should be "not guilty" if the State "failed to prove any one or more of the . . . elements beyond a reasonable doubt," and that McCammon was not required to prove his innocence.  These instructions fairly stated the law and caused no injustice.  Accordingly, the trial judge did not abuse his discretion by refusing D-3.

### B.     Reasonable Doubt (D-4)

¶98.   McCammon's proposed instruction D-4 read, "The Court instructs the jury that a reasonable doubt may arise from the whole of the evidence, the conflict of the evidence, the lack of evidence, or the insufficiency of the evidence; but however it arises, if it arises, it is your sworn duty to find the defendant 'Not Guilty.'"  The trial judge denied the instruction because he concluded that it was "an attempt to either tell the jury how to deliberate or define

36

reasonable doubt."

¶99.   In *Thompson*, 230 So. 3d at 1052-53 (¶¶27-31), we also held that the trial judge did not abuse his discretion by denying this same instruction. *Thompson* followed our Supreme Court's decision in *Roby v. State*, 183 So. 3d 857, 874 (¶69) (Miss. 2016), which held that a trial judge did not abuse his discretion by denying the same instruction because the requirement of proof beyond a reasonable doubt was fairly covered by the court's general instructions. Likewise, the trial judge in this case did not abuse his discretion by denying McCammon's proposed instruction D-4.

### C.    Other Acts (D-5)

¶100.  McCammon's proposed instruction D-5 read:

> The Court instructs the Jury that the testimony of other acts as to a child which are not the subject of the Indictment being charged in this case is not evidence that the Defendant actually committed the crime charged herein or that the Defendant has a certain character and he acted in conformity therewith. Rather, the evidence, if proven beyond a reasonable doubt, may be considered, if you so determine, as to the Defendant's motive, opportunity, intent, preparation, and or plan to commit the act for which he stands charged.

The State argued at trial that D-5 was confusing because it suggested that the "other acts" related to another child. The State also argued that D-5 was an incorrect statement of law because it said the "other acts" had to be proven beyond a reasonable doubt. The trial judge refused D-5 and gave S-3 instead.

¶101.  Instruction S-3, which is quoted above, *see supra* ¶69, is the same instruction that our Supreme Court found to be sufficient in *Gore*, 37 So. 3d at 1184, 1187 (¶¶14, 21). In discussing this issue above, we have already concluded that the State's evidence and the

37

instructions should have made more clear which instance of sexual abuse was the subject of the indictment in this case. *Caldwell*, 6 So. 3d at 1079 (¶8). However, consistent with the Supreme Court's decision in *Caldwell*, we have also concluded that the error in this regard is harmless. *Id.* at (¶9). For the same reasons, we conclude that any deficiency in the jury instruction was harmless error.

## VIII. Sufficiency and Weight of the Evidence

¶102. Finally, McCammon argues that his conviction should be reversed and rendered because there is insufficient evidence to support it or, alternatively, that he is entitled to a new trial because the jury's verdict is against the overwhelming weight of the evidence. McCammon raises these issues together under a single argument heading. We recognize that these are distinct issues, *see, e.g.*, *Thomas v. State*, 48 So. 3d 460, 469 (¶20) (Miss. 2010), but they can be addressed together in this case.

¶103. When we address a challenge to the sufficiency of the evidence, all credible evidence of guilt must be taken as true, and the State is entitled to all reasonable inferences that may be drawn therefrom. *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018). We will reverse and render if the evidence is such that reasonable jurors could not have found the defendant guilty beyond a reasonable doubt. *Id.* But we must affirm the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Shelton v. State*, 214 So. 3d 250, 256 (¶29) (Miss. 2017)).

¶104. We review the denial of a motion for a new trial for an abuse of discretion. *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). We "view the evidence in the light most

favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 289 (¶1). We do not "assume[] the role of juror on appeal. We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.*

¶105. "The uncorroborated testimony of the victim in a case such as this is sufficient evidence to convict if accepted as true by the finder of fact." *Bell v. State*, 835 So. 2d 953, 954, 957 (¶2, ¶17) (Miss. Ct. App. 2003) (affirming convictions for sexual battery and attempted sexual battery of eight-year-old girls). "The testimony of a single uncorroborated witness is sufficient to sustain a conviction, even [if there is] more than one person testifying to the contrary." *Williams v. State*, 512 So. 2d 666, 670-71 (Miss. 1987) (citations omitted) (affirming the denial of the defendant's new trial motion). "Unless testimony necessary to support the jury's verdict is so implausible or so substantially impeached as to be unworthy of belief, the jury's decisions in such matters is beyond the authority of a reviewing court to disturb." *Brown v. State*, 764 So. 2d 463, 467 (¶9) (Miss. Ct. App. 2000); *see also Vaughn v. State*, 759 So. 2d 1092, 1099 (Miss. 1999) (holding that the State presented sufficient evidence to sustain a conviction for sexual battery of a child because "[t]he testimony is conflicting, but [the victim's testimony had] not been absolutely discredited or contradicted," and "the jury is tasked to pull truth from the conflicting morass").

¶106. In this case, the evidence was sufficient to sustain the conviction, and the jury's verdict was not contrary to the overwhelming weight of the evidence. The jury heard the

testimonies of LAV and McCammon and also watched McCammon's two statements to law enforcement. LAV's testimony was not so implausible, impeached, or contradicted as to be unworthy of belief. Indeed, McCammon admitted to a sexual encounter with LAV, but he claimed that the seven-year-old began performing oral sex on him while he slept. Furthermore, while McCammon points to inconsistencies in the details of LAV's statements and testimony, her basic account of the sexual abuse remained consistent over time. We also note that McCammon's version of events changed significantly between his first and second interviews with law enforcement. Based on the evidence presented at trial, the jury was entitled to credit LAV's testimony that McCammon sexually abused her. The jury was not required to accept McCammon's claim that LAV performed the act on him, unsolicited, while he slept.

## CONCLUSION

¶107. McCammon's conviction and sentence are **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. TINDELL AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**